# Supreme Court of Florida

_____

No. SC14-2276
_____

**RANDY W. TUNDIDOR,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[April 27, 2017]

PER CURIAM.

Randy W. Tundidor appeals his conviction of first-degree murder and sentence of death as well as his two convictions for attempted felony murder. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we vacate Tundidor's two convictions of attempted felony murder, deny all other claims raised on appeal, and affirm Tundidor's conviction for first-degree murder and sentence of death.

## I. BACKGROUND

Randy W. Tundidor was convicted of first-degree murder of Joseph Morrissey (Count I), two counts of attempted first-degree murder and two counts

of attempted felony murder of Linda Morrissey and Patrick Morrissey (Counts II–V), two counts of armed kidnapping of Joseph Morrissey and Linda Morrissey (Counts VI–VII), armed burglary (Count VIII), armed robbery of Joseph Morrissey and Linda Morrissey (Count IX), and arson (Count X).  Joseph and Linda Morrissey, husband and wife, were Tundidor's landlords.  Patrick Morrissey is Joseph and Linda's son, who was five years old at the time of the crimes.

At trial, the State presented the testimony of Linda Morrissey and Tundidor's son, Randy H. Tundidor ("Junior"), among other evidence that demonstrated the following.  In December 2009, Tundidor rented a townhouse from the Morrisseys and moved in with his fiancée, Hilda Mendieta, Hilda's children and mother, and Tundidor's other son, Shawn Tundidor.  Shortly after moving in, Tundidor began conducting repairs on the townhouse and then deducting the costs from his rent payment, which caused a dispute with the Morrisseys.  In a letter dated April 2, 2010, Joseph informed Tundidor that he was in violation of the lease.  On April 5, 2010, Tundidor received the letter at his townhouse and became very upset and angry with Joseph.

Tundidor left the townhouse and called his son, Junior, to ask him if he knew someone who could hurt Joseph.  Junior offered to help Tundidor scare Joseph if Tundidor would let Junior stay with him at the townhouse.  Later that

evening, Tundidor picked Junior up in Hollywood and then drove to Tundidor's business.

Once at the business, Tundidor told Junior that Joseph was evicting him and destroying his family. During the conversation, Tundidor gathered some items, including a cleaned and loaded silver .380-caliber gun, eight to ten sets of wire cuffs made from zip ties, a screw driver, a big knife, and a set of walkie-talkies, placing these items inside a box. The plan was for Junior to enter the Morrisseys' house, tie them up, and then search for anything of value. Tundidor told Junior to use the walkie-talkies for communication and to turn off his cell phone so the police could not track it. From the business phone line, Tundidor called Hilda, his fiancée, and asked her to "MapQuest" directions to the Morrisseys' house, and she read the results to Tundidor over the phone. Tundidor and Junior left the business at 10:37 p.m. and drove to the Morrisseys' house.

Once at the Morrisseys' house, Junior armed himself with the gun and entered the house through an open window. Junior did not hide his face, but he wore two layers of gloves. Junior walked through the house to a lighted room where he found Linda. Junior asked for Joseph, and Linda brought Junior to the living room where Joseph was sleeping on the couch. Junior yelled to wake Joseph. Next, Junior used the zip tie cuffs to bind Linda's and Joseph's hands, and then he directed them to the master bedroom. Patrick was sleeping on the bed in

the master bedroom, but Junior did not wake him. Junior had Linda and Joseph kneel by the bed, and he covered their heads with towels so they could not see. During this time, Junior was communicating with Tundidor using the walkie-talkies to tell him what steps had been completed.

Next, Junior left the Morrisseys in the bedroom and let Tundidor into the house through the front door. Once inside, Tundidor directed Junior to look for valuables. Junior returned to the bedroom and demanded things of value. Linda offered Junior her wedding ring and some other jewelry, but Junior did not take it because he did not think it was valuable. Junior went through Joseph's wallet, but only found a few dollars and some euros. Junior left the bedroom to go talk to Tundidor. Tundidor told Junior that he wanted money and that Junior had to take the Morrisseys to the ATM to withdraw $5,000. Junior returned to the bedroom and told the Morrisseys that they were going to the bank to withdraw $5,000. They took the Morrisseys' car, and Junior made Joseph drive with Linda in the front passenger seat while Junior sat in the back seat with the gun. Junior left Patrick at the house because he did not want to wake him. When at the ATM machine, Linda was only able to withdraw $500, which she gave to Junior.

After returning to the house, Junior brought Linda and Joseph back into the master bedroom, where he used a new set of zip ties to bind their wrists. Junior covered Joseph's and Linda's heads again. Patrick was still asleep on the bed.

Junior used the walkie-talkie to report to Tundidor that the Morrisseys were tied up and scared and that he had obtained some money from them. Tundidor reentered the house, and Junior gave Tundidor the $500. Tundidor began looking around at the Morrisseys' electronic equipment. Tundidor directed Junior to take the Morrisseys' two laptops and put them in Tundidor's car; the laptops were later found at Tundidor's business during a search of the premises.

Next, Tundidor announced to Junior that Joseph had to die. Junior argued with Tundidor, but ultimately, Junior gave the gun to his father and retrieved Joseph from the master bedroom. Junior entered the master bedroom and first bound the Morrisseys' feet together with sets of zip ties. Junior then forced Joseph to hop to the living room. Tundidor threw Joseph on the couch as Junior watched. With gun in hand, Tundidor put a pillow to Joseph's head and pulled the trigger, but the gun jammed. Tundidor gave the gun to Junior and then retrieved the large knife from the box.

Wearing gloves borrowed from Junior, Tundidor stabbed Joseph in the stomach area. Joseph begged for his life as he was being stabbed. Eventually, Joseph stood up, bleeding from the stomach area and his hands. Tundidor swung the knife at Joseph's head and neck area, making contact there. Joseph fell to the floor. After stabbing Joseph, Tundidor handed the knife to Junior and told him to put it back in the box and to put the box in the car. Junior complied. Junior

testified that Tundidor had no difficulty swinging the knife or moving about the house; Tundidor was not limping and was not using oxygen.

Next, Junior and Tundidor went into the garage. Tundidor saw a gas can and directed Junior to pick it up. Junior handed the gas can to Tundidor, and Tundidor started spreading gasoline around the house, starting in the living room and kitchen. Tundidor announced he wanted to kill Linda and Patrick too, saying, "They got to go too." Junior protested, angering his father. Tundidor then lit a fire near Joseph. Junior left the house, and Tundidor followed him out the front door. Tundidor left Linda and Patrick in the bedroom; Linda had her hands tied behind her back and feet tied together, but Patrick was unrestrained.

Linda testified that she struggled and managed to get one hand free from her restraints. During the stabbing, she heard Joseph cry and plead, but was unable to get to him because her feet were bound. She was able to see Joseph moving and twitching like he was being hurt. Then, she saw an orange light coming from the kitchen and heard the fire alarm go off. Linda next heard the two men leave the house through the front door.

Linda tried to hop, but she fell and hurt her arms. Linda called to Patrick and asked him to get scissors; Patrick found a pair and was able to cut Linda free from her restraints. At this point, the house was full of smoke. Patrick crawled to the front door, and Linda looked for Joseph, finding his body in the family room.

Linda called to Joseph, but he did not respond. Linda ran outside and screamed for help. Getting no immediate response, Linda ran back inside to Joseph and realized there was "slippery stuff" on the floor and that Joseph was on fire. Linda struggled to pull Joseph out of the house and eventually got Joseph outside on the patio, but he was unresponsive.

An officer who responded to the scene testified that he found the house filled with smoke and Joseph with his hands and feet bound together, covered in blood, lying on the back patio. The officer smelled gasoline and saw a gas can in the living room and a fire in the kitchen. A fireman testified that he saw a gas can near the front door and could smell gasoline in the air. Linda testified that she had last seen her gas can near the garage door and that she did not know how it came to be near the front door. Junior's DNA was found on the gas can. Also, the shirt Junior wore at the time of his arrest had Joseph's blood on it.

Detective Kendall testified that he arrived on the scene in the early morning hours on April 6, 2010. Based on an interview with Linda, he initially suspected Junior, and he put a warrant out for Junior's arrest. Detective Kendall also sent an officer to observe Tundidor's home in an unmarked car.

Dr. Trelka, the medical examiner, testified that Joseph suffered multiple stab wounds, blunt force trauma, and thermal injuries. Dr. Trelka noted burns to Joseph's scalp and the right side of his neck and shoulder. Joseph may have been

alive when he was burned based on the redness of his skin around the burn areas; however, the carbon monoxide level in his blood was negative. If Joseph was alive when burned, it was not for long. Dr. Trelka noted that there was movement between Joseph and his assailant during the stabbings. The stabbing injury to Joseph's hand and finger was potentially fatal and could have been a defensive wound. A knife capable of causing the injuries to Joseph had to be a very sharp, solid weapon and at least seven or eight inches long. The knife the police obtained, a bowie knife, which was the same as the knife missing from Tundidor's collection, was consistent with the injuries Dr. Trelka observed.

Junior testified that after leaving the Morrisseys' house, Tundidor and Junior drove back to Tundidor's business. Once there, Tundidor gave Junior $60 so Junior could go buy drugs. About an hour later, Junior returned and found that Tundidor had burned the clothes he wore to the Morrisseys' house and changed into a different set of clothes. Tundidor and Junior then left the business and drove to Tundidor's townhouse. Tundidor gave Junior the knife, which had been cleaned and ground down, and asked Junior to get rid of it. Junior threw the knife into a nearby lake.

Junior testified that after arriving home, he went into Tundidor's garage to use coke. Junior did not change his clothes. Later in the day on April 6, 2010, the police came to the house to talk to Tundidor, and Junior hid in the attic. After the

- 8 -

police left, Tundidor told Junior that the police were looking for Junior.  Junior spent the rest of the day in the attic taking drugs.  Tundidor woke Junior up in the early hours of April 7, 2010, and told Junior to leave.  Junior went to a gas station where he made some phone calls.  Within about 45 minutes of arriving at the gas station, Junior was arrested.

Junior was taken to the police station where he met with Detective Kendall.  In that meeting on April 7, 2010, Junior "gave him a story," making up names of people that he said were involved in the crimes because he did not want to be charged with murder.  Later, on April 29, 2010, Junior spoke with Detective Kendall again, disclosing much, but not all, of what had transpired.  Junior testified that he changed his mind and decided to tell the truth and testify against Tundidor because Tundidor was blaming the crimes on Junior and Shawn (Junior's brother and Tundidor's son).  In exchange for Junior's testimony against Tundidor, the State reduced the charge to second-degree murder, eliminating the possibility of a death sentence, and Junior agreed to plead guilty to all other charges.

The police searched Tundidor's business and found zip ties similar to those used to bind the Morrisseys, a set of walkie-talkies, and euros in the garbage can.  Police documented a burn area in the parking lot, and residue from the area was collected.  A surveillance video recorded the burning at 2:30 a.m. on April 6, 2010.

Hilda testified that on April 6, 2010, she learned about the murder on the 6 a.m. news. Junior was at home, which was uncommon. Junior saw the news and looked scared. When Hilda confronted Tundidor about the murder, he asked whether she really wanted to know, and Hilda replied that she did not.

Later that morning, Hilda and Shawn went to work at Tundidor's business and noticed that a bowie-like knife was missing. They also smelled gasoline and a burning odor. The smells were coming from the bathroom and back of the shop. They also saw burn marks in the bathroom and ashes in the parking lot, which had not been there previously. Tundidor told Hilda that he burned Junior's crack pipe and asked her to sweep it away, which she did. Hilda testified that the pile she swept up was "pretty big" and looked like pieces of clothing.

On April 9, 2010, Tundidor asked Hilda to get rid of his silver and black gun. When she refused, he said, "[Y]ou want me to go to jail?" He then locked himself in his room, and she heard him using power tools. Later that day, Hilda found holes and gouges in the drywall of her bedroom where no such marks had existed before.

Shawn testified that on April 5, 2010, he returned home between 9:30 and 10 p.m., before the crime took place, and immediately made a phone call. He did not leave the house again that evening and was on the phone until 1 or 2 a.m. Tundidor was not home when Shawn fell asleep on the couch. Yoska Guillen

confirmed that Shawn was on the phone with her on April 5, 2010. This call lasted from 11:20 p.m. until 12:10 a.m. the next morning. During that time, Shawn did not disconnect, and Yoska said she did not hear noises in the background or Shawn talking to anyone else. Hilda also testified that on April 5, Shawn returned home that evening at about 8 p.m. and was on the phone for a very long time, until 10 to 10:30 p.m. While she did not see him the rest of the night, she heard him in the house. Hilda believes she would have been alerted by the alarm noises if Shawn had left the house the night of the crimes.

The following morning, Shawn learned about the Morrisseys on the news and asked Junior what happened. Junior replied that he should ask Tundidor. When Shawn confronted Tundidor, who was also watching the news, Tundidor said: "Nobody f***s with [Tundidor] and gets away with it." Shawn did not press his father any further and just went to work at Tundidor's business. When Shawn arrived at Tundidor's business, he found the doors locked and alarm set. Upon entering, he noticed that a knife was missing from the display case and its box was on the floor. He found the sink stained with burn marks and a big black burn stain outside near the garage door with ash, clothing pieces, and other material.

Following Junior's arrest, Shawn confronted Tundidor. Tundidor admitted to Shawn that Junior did not know that Joseph was going to die that night; Junior only thought they were going to rob the Morrisseys and that Junior would get

money for crack cocaine. Tundidor admitted to Shawn that he sent Junior into the Morrisseys' house to tie up the Morrisseys. Shawn inquired about white sneakers he had left in the car, and Tundidor replied that "they were not white when I was done with them." Tundidor also complained that Joseph was trying to evict him, and Tundidor said he could not let his family be thrown out on the streets, following up with "nobody f***s with [Tundidor]" and "nobody gets away with it." Also, Tundidor asked Shawn to retrieve the rent checks from the mailbox as he no longer had to pay the landlord since he was dead.

As a result of this conversation, Shawn asked the police to let him wear a wire. The resulting recording was played for the jury. On the tape, Tundidor said that Junior had the Morrisseys drive to the bank and withdraw money, that Linda could not identify either him or Junior, that the worst things the police had were the laptops from the house, and that he would pin the murder on "Will" before letting Junior take the blame for murder. Also, Tundidor is heard on the tape saying, "The murder weapon, they ain't gonna find it." Tundidor then told Hilda and Shawn to "look the other way" and not "ask" him things or try to figure things out. On cross-examination, the defense explored Shawn's police statements in which he initially lied to give Junior an alibi, only to later state that Tundidor admitted to going to the Morrisseys' house and killing Joseph.

- 12 -

During the guilt phase, Tundidor's counsel argued that Junior and Shawn were responsible for the murder. Tundidor's counsel emphasized Junior's inconsistent statements to the police and statements that Junior made to other jail inmates. Tundidor's counsel also highlighted Tundidor's medical problems and physical limitations. Nonetheless, on May 9, 2012, the jury returned a verdict of guilty on each count.

Tundidor waived mitigation for the penalty phase. On October 12, 2012, an ex parte Koon/Muhammad[1] hearing was held before Judge Bidwill. A psychologist testified that she found Tundidor competent to proceed and waive mitigation and that Tundidor's counsel and mitigation expert had discussed the available mitigation with Tundidor. Judge Bidwill also questioned Tundidor. Judge Bidwill determined that Tundidor was making a knowing, intelligent, and voluntary waiver of mitigation, and the case was returned to the trial judge.

At the penalty phase, the State presented evidence from the medical examiner that Joseph was alive at the time of all of his injuries. Additionally, the State presented victim impact statements from Linda and Patrick, Joseph's widow and son. Tundidor argued against aggravation but presented no mitigation. The jury returned a unanimous recommendation for death.

_____

1. See Koon v. Dugger, 619 So. 2d 246 (Fla. 1993); Muhammad v. State, 782 So. 2d 343 (Fla. 2001).

- 13 -

At the Spencer[2] hearing, Tundidor again waived mitigation. However, Tundidor presented evidence of residual doubt, proclaiming his innocence and blaming Junior and Shawn. The trial judge appointed Mitch Polay to investigate and present evidence on mitigation.

On November 7, 2014, the trial court sentenced Tundidor to death for the murder of Joseph Morrissey. The trial court found the following aggravators: (1) Tundidor was previously convicted of another capital felony or of a felony involving the use or threat of violence (great weight); (2) the crime was committed while he was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit the crimes of armed kidnapping and arson (great weight); (3) the capital felony was committed for pecuniary gain (great weight); (4) the capital felony was especially heinous, atrocious, or cruel (HAC) (great weight); and (5) the crime was committed in a cold, calculated, and premeditated manner (CCP) (great weight). Additionally, the trial court found the following mitigators: (1) no significant history of prior criminal activity (very little weight); (2) Tundidor had a chaotic and dysfunctional family upbringing (little weight); (3) Tundidor was forced to quit school at a young age (very little weight); (4) Tundidor suffered from physical injuries and pain (very little weight);

---

2. See Spencer v. State, 615 So. 2d 688 (Fla. 1993).

(5) Tundidor was gainfully employed and ran a successful business (minimal weight); (6) Tundidor was a Red Cross volunteer and did volunteer work for his church (very little weight); (7) Tundidor was well-behaved while awaiting trial in jail (slight weight); and (8) Tundidor has maintained positive relationships (minimal weight).

## II. ISSUES ON APPEAL

Tundidor raises thirteen issues on appeal. We also review whether there is sufficient evidence to support Tundidor's conviction. However, as explained below, except for Tundidor's double jeopardy claim, none of these issues warrants relief.

### A. Junior's Statement to Detective Kendall

Tundidor first argues that the trial court abused its discretion when it allowed Detective Kendall to testify as to what Junior said in his April 29, 2010, statement. We disagree.

When Junior was arrested, he met with Detective Kendall and initially claimed that two fictitious individuals were responsible for Joseph's murder. Approximately three weeks later, on April 29, 2010, Junior met with Detective Kendall again and stated that he and Tundidor were responsible for the murder. At trial, Junior testified against Tundidor, consistent with his April 29, 2010, statement. On cross-examination, Tundidor's counsel questioned the truthfulness

of Junior's testimony by asking, "The lie that you want the jury to believe . . . is the one that gets you off the hook[?]"  Near the end of the State's case-in-chief, the State called Detective Kendall to testify regarding the April 29, 2010, meeting. Tundidor objected to the testimony as hearsay, but the trial court allowed it.

Admissibility of evidence is within the sound discretion of the trial court, and the trial court's ruling will not be disturbed on appellate review unless there is an abuse of discretion.  Peterson v. State, 2 So. 3d 146, 158 (Fla. 2009). "However, the question of whether a statement is hearsay is a matter of law and is subject to de novo review on appeal."  Cannon v. State, 180 So. 3d 1023, 1037 (Fla. 2015), cert. denied, 136 S. Ct. 2389 (2016).

If a declarant testifies at trial and is subject to cross-examination concerning the out-of-court statement, then the statement is not hearsay if that statement is "[c]onsistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of improper influence, motive, or recent fabrication."  § 90.801(2)(b), Fla. Stat.

In this case, the trial court did not abuse its discretion in allowing Detective Kendall's testimony regarding Junior's April 29, 2010, statement.  Tundidor's counsel implied that Junior had an improper motive when counsel referenced Junior's plea deal, and in so doing, Tundidor opened the door for the State to rebut that inference.  Therefore, because Detective Kendall's testimony was consistent

- 16 -

with Junior's trial testimony and it was introduced by the State to refute Tundidor's inference that Junior had an improper motive, Detective Kendall's testimony fell within section 90.801(2)(b), Florida Statutes, and was admissible.  See Rodriguez v. State, 609 So. 2d 493, 500 (Fla. 1992) (holding that section 90.801(2)(b) applied when "[d]efense counsel's references to plea agreements with the state during cross-examination of [witnesses] were sufficient to create an inference of improper motive to fabricate," and the State could introduce statements made "prior to the plea negotiations and therefore prior to the existence of both witnesses' motive to fabricate").  The trial court did not abuse its discretion.

## B.  Discovery Deposition

Next, Tundidor argues that the trial court erred by admitting the deposition of Junior's former girlfriend, Anna Sanchez, at trial.  We disagree.

Because Anna was unavailable at trial, Tundidor offered Anna's five-page-long Arthur[3] hearing testimony in which she discussed things Shawn told her regarding Joseph's murder.  In response, the State sought the admission of Anna's deposition testimony, arguing that the deposition would give the jury a more complete picture as to her testimony and that the deposition followed up on issues

---

3.  See State v. Arthur, 390 So. 2d 717 (Fla. 1980).

addressed in her <u>Arthur</u> hearing testimony. Although Tundidor protested, the trial court admitted both the <u>Arthur</u> hearing and the deposition testimony.

Section 90.108(1), Florida Statutes, provides that, "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him or her at that time to introduce any other part or any other writing or recorded statement that in fairness ought to be considered contemporaneously." This rule of completeness is not limited to situations where statements are taken out of context, and "[u]nder a plain reading of the statute, parties may seek the introduction of other statements when those statements 'in fairness ought to be considered contemporaneously' with the introduction of the partial statement." <u>Larzelere v. State</u>, 676 So. 2d 394, 402 (Fla. 1996) (quoting § 90.108, Fla. Stat. (1991)); <u>see also</u> <u>Eberhardt v. State</u>, 550 So. 2d 102, 105 (Fla. 1st DCA 1989) (holding that once testimony of a conversation came in, the rule of completeness allowed admission of the balance of that conversation and "conversations other than the one [the witness] mentioned on direct examination"). "The admissibility of evidence is within the sound discretion of the trial court, and the trial court's determination will not be disturbed on appellate review absent a clear abuse of that discretion." <u>Gosciminski v. State</u>, 132 So. 3d 678, 697 (Fla. 2013) (quoting <u>Brooks v. State</u>, 918 So. 2d 181, 188 (Fla. 2005)).

Here, Anna's deposition was admissible under section 90.108. The Arthur hearing testimony was only five pages long and, due to its brevity, might have provided an incomplete impression to the jury regarding Anna's interaction with Shawn. For example, at the Arthur hearing, Anna simply said that she and Shawn had a falling out; whereas, in the deposition testimony, Anna added that the falling out occurred after she and Junior broke up, and that she and Shawn "just stopped talking." Further, in her deposition, Anna provided more information regarding her conversation with Junior's attorney and what happened when she went to the police department to inform them about what Shawn had said.

Given the relation between the Arthur hearing and deposition testimonies, we hold that the trial court did not abuse its discretion in admitting the deposition testimony.

### C. Recorded Conversation

Next, Tundidor argues that the recording of his conversation with Shawn was inadmissible because it does not fall under the statutory exception for the use of secret recordings. We disagree.

Section 934.06, Florida Statutes, provides that secret recordings cannot be used as evidence unless an exception applies. See McDade v. State, 154 So. 3d 292, 297 (Fla. 2014). Section 934.03(2)(c) provides an exception to the general rule prohibiting secret recordings when the recording is made "under the direction

of an investigative or law enforcement officer."  Further, absent an abuse of discretion, a trial court's admission of evidence will not be disturbed on appeal. Peterson, 2 So. 3d at 158.

Detectives initially made contact with Shawn and asked that Shawn contact them if he had any information regarding Joseph's murder.  Shawn later had conversations with his father, which motivated Shawn to contact the police. Shawn told the detectives that Tundidor said he was responsible for the murder and Junior only thought they were only going to rob the Morrisseys.  Shawn offered to wear a recording device because the "detectives didn't believe [him]."  The detectives agreed to the plan, outfitted Shawn with the recording device, and then took Shawn home.  Shawn went to speak to Tundidor and made the recording that is at issue.  The next morning, Shawn gave the detectives the recording.

The fact that Shawn was the one to suggest that he wear a wire does not affect whether the recording was made "under the direction of an investigative or law enforcement officer" and does not prevent application of section 934.03(2)(c). In Mead v. State, 31 So. 3d 881, 882 (Fla. 4th DCA 2010), the court held that a recording may qualify under the exception in section 934.03(2)(c), even if the witness is the first person to suggest making the recording.  Further, in Mead, the supervisor only gave a verbal authorization to make the recording, but in this case the police were even more involved by providing the recording equipment and

driving Shawn to and from the police station before and after Shawn made the recording. See id.

Accordingly, because the police agreed to Shawn's suggestion of recording his conversation with his father and helped him to do so by providing the recording equipment and transportation, the recording was made under the direction of the police, and the trial court did not abuse its discretion in admitting the recording.

## D. Text Messages

Tundidor also asserts that the State improperly introduced text messages in its rebuttal case because the text messages did not refute a theory brought out in his case-in-chief and did not impeach a defense witness. However, we conclude that the trial court did not abuse its discretion in admitting this evidence.

After Tundidor rested, and over Tundidor's objection, the State recalled Detective Kendall as a rebuttal witness to testify to the content of text messages exchanged between Tundidor and Shawn on April 5 and 6, particularly a message that Tundidor sent to Shawn saying, "Don't want you involved."

"Generally, rebuttal testimony is permitted to refute a defense theory or to impeach a defense witness." Rimmer v. State, 825 So. 2d 304, 321 (Fla. 2002). A trial court's decision to allow a party to offer rebuttal testimony is subject to an abuse of discretion standard of review. Cruse v. State, 588 So. 2d 983, 990 (Fla. 1991). "Discretion is abused only when the judicial action is arbitrary, fanciful, or

unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court." White v. State, 817 So. 2d 799, 806 (Fla. 2002).

In this case, Tundidor presented evidence regarding Shawn's involvement in the murder by having inmates testify that Junior told them that Shawn was involved and not Tundidor. This theory of the crime, that Shawn was responsible for the murder, opened the door for the State's rebuttal. Here, the State's rebuttal testimony pertained to communications between Tundidor and Shawn, specifically when Tundidor sent a text to Shawn saying, "Don't want you involved." These communications before the crimes occurred directly related to Shawn's degree of involvement, which was an issue raised by Tundidor's defense. Cf. Glynn v. State, 787 So. 2d 203, 204 (Fla. 4th DCA 2001) (holding that the trial court did not abuse its discretion admitting defendant's prior statement as rebuttal to defense's expert testimony that defendant was incapable of committing the crime).

Therefore, we hold that the trial court did not abuse its discretion by allowing the State to introduce text messages in its rebuttal.

### E. Expert Opinion Testimony

Tundidor claims that the trial court permitted the State to introduce improper expert opinion testimony by allowing Dr. Bertot to testify on cross-examination that Tundidor's physical limitations regarding his ability to commit a stabbing

- 22 -

murder would be the pain associated with his knee and shoulder injuries. We disagree.

Admission of evidence is within the court's discretion, and its ruling will be affirmed unless there has been an abuse of discretion. Williams v. State, 967 So. 2d 735, 747–48 (Fla. 2007). However, when it is apparent that an expert opinion is based on insufficient data, it is inadmissible. Husky Indus., Inc. v. Black, 434 So. 2d 988, 992 (Fla. 4th DCA 1983).

In this instance, the expert witness, Dr. Bertot, was given sufficient data from which to form an opinion because Dr. Bertot had been treating Tundidor for his orthopedic issues. And although Tundidor argues that Dr. Bertot was not treating him for all of his health issues, such as breathing difficulty or obesity, Dr. Bertot took a medical history and documented these conditions when assessing Tundidor. Therefore, Dr. Bertot had sufficient data regarding Tundidor's medical condition in order to formulate an expert opinion as to Tundidor's physical limitations. Cf. Brennan v. State, 754 So. 2d 1, 4 (Fla. 1999) (holding that the trial court did not err when it allowed expert testimony from a medical examiner regarding "the victim's cause of death, despite the fact that the expert did not perform the autopsy" because the medical examiner made independent conclusions using objective evidence).

Therefore, we hold that the trial court did not abuse its discretion when it allowed Dr. Bertot to testify on cross-examination as an expert witness regarding Tundidor's physical limitations.

## F.  Privileged Statements

Tundidor asserts that the trial court erred when it concluded that Junior's statements to Junior's attorney during a meeting with Tundidor and Tundidor's attorney were privileged.  We disagree.

Generally, private conversations between attorneys and their clients are protected by privilege.  See § 90.502, Fla. Stat.; see also McWatters v. State, 36 So. 3d 613, 636 (Fla. 2010).  But if the communication is voluntarily made in the presence of a third-party, the privilege will typically be lost.  See Nova Se. Univ., Inc. v. Jacobson, 25 So. 3d 82, 86 (Fla. 4th DCA 2009).  However, communications between codefendants and their counsel regarding issues of their joint defense are still protected by privilege.  See Volpe v. Conroy, Simberg & Ganon, P.A., 720 So. 2d 537, 539 (Fla. 4th DCA 1998).

In this case, codefendants Tundidor and Junior met with their counsel at the jail.  Junior's counsel testified that the purpose of the meeting was for the attorneys to discover what happened.  Therefore, the communications fall within the exception to the third-party rule, and the communications at this meeting were still protected by attorney-client privilege.  See id. ("Where, however, co-parties

- 24 -

communicate regarding issues of common interest to their joint defense to adequately prepare their case, the sharing of information with their co-parties' attorneys implies no waiver of the privilege."); <u>Visual Scene, Inc. v. Pilkington Bros.</u>, 508 So. 2d 437, 440 (Fla. 3d DCA 1987) ("An exception to this general waiver rule, variously called the 'common interests,' 'joint defense,' or 'pooled information' exception, enables litigants who share unified interests to exchange this privileged information to adequately prepare their cases without losing the protection afforded by the privilege.").

Accordingly, the trial court did not abuse its discretion in ruling that Junior's attorney did not have to testify regarding the statements Junior made during a meeting with Tundidor and Tundidor's attorney.

### G.  Motion to Disqualify Trial Judge

Tundidor argues that the trial court erred in denying his motion to disqualify the trial judge after the guilt and penalty phases but before the <u>Spencer</u> hearing. Because the motion was untimely, we affirm its denial.

A motion to disqualify must be filed within 10 days after discovery of the facts that are the grounds for the motion.  Fla. R. Jud. Admin. 2.330(e).

In this case, the trial judge's DUI arrest on November 5, 2013, was the basis for Tundidor's motion.  The arrest was public knowledge on November 6, 2013,

yet Tundidor did not file the motion until December 5, 2013. Because the motion was filed well outside of the 10-day timeframe, it was untimely.

Therefore, the motion was properly denied because it was untimely.

## H. Motion for New Trial

Additionally, Tundidor claims that the trial court erred when denying his renewed motion for a new trial. However, we disagree.

Florida Rule of Criminal Procedure 3.600(a) provides that "[t]he court shall grant a new trial if . . . [t]he verdict is contrary to law or the weight of the evidence." "A trial court's denial of a motion for a new trial is reviewed under an abuse of discretion standard. In order to demonstrate abuse, the nonprevailing party must establish that no reasonable person would take the view adopted by the trial court." Stephens v. State, 787 So. 2d 747, 754 (Fla. 2001).

In this case, the verdict is not contrary to the weight of the evidence. For example, Junior and Shawn, Tundidor's sons, testified against him. Junior testified that Tundidor asked him to help him scare his landlord, and brought with him a gun and a seven- or eight-inch-long bowie knife. Junior further testified how Tundidor accompanied him to the house and how Junior carried out his father's directives. Shawn testified that when Tundidor was asked about Joseph's murder, Tundidor made comments such as, "Nobody f***s with [Tundidor] and gets away with it." Hilda testified that when she went to Tundidor's business on April 6,

- 26 -

2010, she smelled gasoline and noticed that a large bowie knife was missing. Hilda also testified that Tundidor asked her to get rid of his silver and black gun, and when she refused, Tundidor yelled, "[Y]ou want me to go to jail?" Furthermore, the search of Tundidor's business returned zip ties similar to those used to bind the Morrisseys, a set of walkie-talkies, and euros in the garbage can.

Accordingly, the trial court did not abuse its discretion when it denied Tundidor's renewed motion for a new trial. See Bryan v. State, 533 So. 2d 744, 750 (Fla. 1988) (upholding denial of a motion for new trial because there was an "abundance of evidence" regarding the identity of the victim and that the defendant accompanied the victim to the location where he was murdered).

## I. Mitigation Witnesses

Tundidor argues that he is entitled to relief because his counsel complied with Tundidor's wishes not to present mitigation witnesses. Essentially, Tundidor is claiming ineffective assistance of counsel because his counsel deferred to the client's decision to waive the presentation of mitigation. This claim does not warrant relief.

Claims of ineffective assistance of counsel are generally "not reviewable on direct appeal but are more properly raised in a motion for post-conviction relief." Kelley v. State, 486 So. 2d 578, 585 (Fla. 1986). "[A]n ineffective assistance of counsel claim may be treated on the merits on direct appeal only in

the 'rare' instance where (1) the ineffectiveness is apparent on the face of the record, and (2) it would be 'a waste of judicial resources to require the trial court to address the issue.' " Robards v. State, 112 So. 3d 1256, 1267 (Fla. 2013) (quoting Blanco v. Wainwright, 507 So. 2d 1377, 1384 (Fla. 1987)).

Moreover, in an appeal of the denial of a postconviction motion with an ineffective assistance of counsel claim regarding the presentation of mitigation evidence, the defendant has the burden to show "that counsel's ineffectiveness 'deprived the defendant of a reliable penalty phase proceeding.' " Henry v. State, 937 So. 2d 563, 569 (Fla. 2006) (quoting Asay v. State, 727 So. 2d 974, 985 (Fla. 2000)). Counsel cannot be deemed deficient for following his client's interest and not presenting mitigation evidence. See id. at 573 ("Given [defendant's] adamant, informed refusal to participate in the investigation and preparation of any type of mitigation, we conclude that counsel's preparation and [defendant's] decision to waive his rights did not deny him of a reliable penalty phase proceeding."); Power v. State, 886 So. 2d 952, 961 (Fla. 2004) (upholding lower court's finding that counsel was not deficient when defendant "interfered with trial counsel's ability to obtain and present mitigating evidence").

As in Henry and Power, the record reflects that Tundidor was adamant about not presenting mitigation, refusing to cooperate with the PSI investigation and the attorney appointed by the trial court to investigate and present mitigating evidence.

- 28 -

Accordingly, Tundidor's counsel cannot be deemed ineffective by following Tundidor's wishes when Tundidor was deemed competent to waive mitigation after discussing the available options with his counsel and mitigation expert and after Judge Bidwill determined that Tundidor was making a knowing, intelligent, and voluntary waiver of mitigation. See Koon, 619 So. 2d at 250 (establishing that when a defendant wants to waive mitigation against his counsel's advice, "[t]he court should then require the defendant to confirm on the record that his counsel has discussed these matters with him, and despite counsel's recommendation, he wishes to waive presentation of penalty phase evidence").

Thus, Tundidor has not demonstrated that his counsel was ineffective on the face of the record.

## J. Mitigating Circumstances

Tundidor also argues that the trial court erred by failing to find two mitigating circumstances and giving little weight to five other mitigating circumstances. We agree that the trial court erred when it rejected the age mitigator, but we disagree with Tundidor's arguments regarding the other mitigators. Moreover, the error regarding the age mitigator was harmless.

Each statutory and nonstatutory mitigator must be identified and evaluated to determine if it is mitigating and established by the evidence, and then the weight for each proven mitigator must be assessed. Ferrell v. State, 653 So. 2d 367, 371

(Fla. 1995). "The finding of whether a mitigating circumstance has been established is a question of fact that will not be overturned where it is supported by competent, substantial evidence." Fletcher v. State, 168 So. 3d 186, 218 (Fla. 2015), cert. denied, 136 S. Ct. 980 (2016). "The age of the defendant at the time of the crime" is a statutory mitigating circumstance. § 921.141(7)(g), Fla. Stat. Middle age may be considered a mitigating factor when the defendant has no significant prior criminal history as it demonstrates "the length of time [the defendant] obeyed the law prior to committing this crime." Burns v. State, 699 So. 2d 646, 648 n.4 (Fla. 1997).

Here, the trial court erred by not finding a statutory mitigating circumstance based on Tundidor's age because the court's rejection of this mitigator is not supported by competent, substantial evidence. The record reflects that Tundidor was 44 at the time of the murder, and the PSI showed no prior criminal history. The trial court considered Tundidor's age only insofar as it pertained to immaturity. However, this error is harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So. 2d 1129, 1138 (Fla. 1986).

The trial court did not err when it concluded that Tundidor's ability to adjust well to prison was not established as a nonstatutory mitigator. Tundidor cites his good behavior in jail as evidence that he could adjust well to prison life. However, as the judge explained when assessing the proposed mitigator, there was no direct

- 30 -

evidence regarding Tundidor's good behavior and only a lack of disciplinary reports. We conclude that competent, substantial evidence supports the trial court's rejection of this mitigating circumstance.

Tundidor also argues that the trial judge erred by not weighing more heavily five of the eight mitigating circumstances that were found to be established. "This Court reviews a trial court's assignment of weight to mitigation under an abuse of discretion standard." Bevel v. State, 983 So. 2d 505, 521 (Fla. 2008). "Discretion is abused 'only when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court.' " Wilcox v. State, 143 So. 3d 359, 389 (Fla. 2014) (quoting Green v. State, 907 So. 2d 489, 496 (Fla. 2005)). Here, the trial court individually assessed each mitigator, determining that each was proved by the evidence and assigning weight to each mitigator. Accordingly, we conclude that the trial court did not abuse its discretion, because the trial court's assignments of weight are supported by competent, substantial evidence and are not arbitrary, fanciful, or unreasonable.

Therefore, except for the rejection of the age mitigator, the trial court did not err with regard to the finding of mitigators and the assignment of weight. Moreover, the error regarding the age mitigator is harmless beyond a reasonable doubt.

## K.  Double Jeopardy

Both Tundidor and the State agree that Tundidor's convictions for two counts of attempted first-degree murder and two counts of attempted felony murder are violations of double jeopardy.  Notably, the trial court withheld sentencing for the two counts of attempted felony murder.  However, Tundidor argues that he is entitled to resentencing with a corrected scoresheet for the noncapital and capital convictions.  We hold that Tundidor's two convictions for attempted felony murder must be vacated.  However, we disagree with Tundidor that resentencing is required.

This issue is reviewed de novo because it presents a pure question of law. See Sanders v. State, 35 So. 3d 864, 868 (Fla. 2010).  "In general, when the vacation of a conviction would result in changes to the defendant's scoresheet, the defendant is entitled to be resentenced using a corrected scoresheet."  Fernandez v. State, 199 So. 3d 500, 502 (Fla. 2d DCA 2016).  However, the error is harmless if the record conclusively shows that the trial court would have imposed the same sentence using a corrected scoresheet.  State v. Anderson, 905 So. 2d 111, 118 (Fla. 2005).  "The standard is no different from the one announced in DiGuilio— whether beyond a reasonable doubt the error did not contribute to the verdict."  Id. The harmless error test places the burden on the State.  DiGuilio, 491 So. 2d at 1139.  This Court explained:

> The would-have-been-imposed test applies this standard to scoresheet error. It requires an examination of the record for conclusive proof that the scoresheet error did not affect or contribute to the sentencing decision. If the reviewing court cannot determine conclusively from the record that the trial court would have imposed the same sentence despite the erroneous scoresheet, remand for resentencing is required.

Anderson, 905 So. 2d at 115–16.

In this case, the State's harmless error argument is persuasive. The State argues that the trial court's findings contained in its sentencing order show the heinousness of Tundidor's actions and lend support for the maximum sentences for each of the noncapital crimes for which he was sentenced. The vacation of the two attempted felony murder convictions would result in a reduction of 92 points on Tundidor's scoresheet. Nonetheless, the trial court sentenced Tundidor to the maximum allowed for each of the noncapital offenses (with the exception of the two counts of attempted felony murder for which it withheld sentencing). Specifically, he was sentenced to the maximum of life imprisonment for each count of armed kidnapping, armed burglary, and armed robbery as well as the maximum sentence of 30 years for each count of arson and attempted first-degree murder. Accordingly, resentencing for the noncapital convictions is not required because it can be determined conclusively from the record that the trial court would have imposed the same sentence, despite the erroneous scoresheet. See Kablitz v. State, 979 So. 2d 969, 972 (Fla. 4th DCA 2008) (concluding that the State had shown "that the same sentence would have been imposed had the

corrections [to the scoresheet] been made" where defendant "was a ten-time convicted felon, and the court sentenced him well above the minimum guidelines sentence"); White v. State, 873 So. 2d 600, 600–01 (Fla. 5th DCA 2004) (holding scoresheet error harmless where the lowest permissible sentence was reduced from 53 to 44.4 months but the record conclusively demonstrated that the trial court would have imposed the same sentence of 53 months with a corrected scoresheet); Mooney v. State, 864 So. 2d 60, 61–62 (Fla. 4th DCA 2003) (affirming as harmless the denial of a claim of scoresheet calculation error because the record demonstrated that the departure sentence would have been imposed despite the error); cf. Hughes v. State, 139 So. 3d 477, 478 (Fla. 2d DCA 2014) ("The error is not harmless because [the defendant] was sentenced to the lowest permissible sentence under the incorrectly calculated scoresheet and nothing in the record conclusively shows the sentence would have been the same under an accurate one."); Budd v. State, 939 So. 2d 1158, 1159 (Fla. 2d DCA 2006) ("Because the record does not conclusively show that the same sentence would have been imposed, particularly where the lowest permissible prison sentence was previously imposed, we reverse and remand for the postconviction court to resentence [the defendant] pursuant to a corrected scoresheet.").

In arguing that resentencing is required for the capital conviction, Tundidor relies on Burr v. State, 576 So. 2d 278, 280–81 (Fla. 1991), claiming that use of an

illegal conviction in capital sentencing violates the Due Process Clause of the state constitution, is not "merely cumulative," and requires resentencing. However, in Burr, the jury returned a recommendation of life, but the trial judge rejected the jury's recommendation and cited three aggravating factors to justify imposing the death penalty. Two of the three aggravating factors were based on inadmissible collateral crimes. Burr, 576 So. 2d at 280. Resentencing was necessary because this Court could not conclude that the inadmissible collateral crimes evidence did not contribute to the trial judge's decision to impose the death penalty, especially because the jury had recommended life. Id. For reasons explained below, Burr is not analogous to the instant case.

Here, the jury voted 12-0 in favor of the death penalty for the capital conviction. Additionally, the sentencing order lays out the reasoning behind the sentence imposed, which indicates that Tundidor's conviction of two additional crimes, which under double jeopardy he should not have been convicted of, did not impact the judge's determination of the sentence. When assessing the prior violent felony aggravating circumstance regarding the first-degree murder sentence, the trial court mentioned the two attempted first-degree murder and two attempted felony murder convictions, but then stated that "either of these contemporaneous convictions would satisfy the aggravating circumstance . . . because they involve different victims than Joseph Morrissey." Thus, resentencing for the capital

conviction is not necessary. See Spann v. State, 857 So. 2d 845, 855 (Fla. 2003) (concluding that any error by the trial court in relying on defendant's prior conviction of battery as a death penalty aggravator was harmless, where any one of the defendant's three prior felony conviction aggravators would have supported the trial court's finding of aggravating circumstance); Mahn v. State, 714 So. 2d 391, 399 (Fla. 1998) (concluding that although robbery conviction was improperly used as a prior violent felony conviction, it was harmless error because contemporaneous convictions of two other homicides satisfied the aggravating circumstance).

Therefore, we vacate the two convictions for attempted felony murder but hold that resentencing is not required for the noncapital or capital convictions.

## L.  Hurst

While Tundidor's appeal was pending, the United States Supreme Court issued its decision in Hurst v. Florida, 136 S. Ct. 616 (2016), in which it held that Florida's capital sentence scheme violated the Sixth Amendment to the United States Constitution. The Supreme Court concluded that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." Id. at 619.

On remand from the United States Supreme Court in Hurst, we stated that "the Supreme Court's decision in Hurst v. Florida requires that all the critical

findings necessary before the trial court may consider imposing a sentence of death must be found unanimously by the jury." Hurst v. State (Hurst), 202 So. 3d 40, 44 (Fla. 2016), petition for cert. filed, No. 16-998 (U.S. Feb. 13, 2017). We further held that "in order for the trial court to impose a sentence of death, the jury's recommended sentence of death must be unanimous." Id. Finally, we explained that Hurst v. Florida error is capable of harmless error review. Id. at 67. Thus, the issue here is whether any Hurst error during Tundidor's penalty phase proceedings was harmless beyond a reasonable doubt.

The standard for evaluating whether the error was harmless beyond a reasonable doubt "is whether there is a reasonable possibility that the error affected the [sentence]." Id. at 68 (quoting DiGuilio, 491 So. 2d at 1139) (alteration in original). "As applied to the right to a jury trial with regard to the facts necessary to impose the death penalty, it must be clear beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravating factors that outweighed the mitigating circumstances." Davis v. State, 207 So. 3d 142, 174 (Fla. 2016), petition for cert. filed, No. 16-8569 (U.S. April 3, 2017); accord Hurst, 202 So. 3d at 67–68.

In this case, the penalty phase jury returned a unanimous recommendation for a sentence of death. "[This] recommendation[] allow[s] us to conclude beyond a reasonable doubt that a rational jury would have unanimously found that there

were sufficient aggravators to outweigh the mitigating factors." Davis, 207 So. 3d at 174. Further:

> Even though the jury was not informed that the finding that sufficient aggravating [factors] outweighed the mitigating circumstances must be unanimous, and even though it was instructed that it was not required to recommend death even if the aggravators outweighed the mitigators, the jury did, in fact, unanimously recommend death. From these instructions, we can conclude that the jury unanimously made the requisite factual findings to impose death before it issued the unanimous recommendations.

Id. at 175 (citation omitted).

Thus, we conclude that the State has sustained its burden of demonstrating that any Hurst error in Tundidor's penalty phase was harmless beyond a reasonable doubt. The jury unanimously found all of the facts necessary for the imposition of the death sentence by virtue of its unanimous recommendation. Accordingly, Tundidor is not entitled to a new penalty phase.

### M.  Proportionality

Tundidor next contends that the death sentence is not proportional. We disagree.

"This Court must review the proportionality of a death sentence, even if the issue has not been raised by the defendant." Bolin v. State, 869 So. 2d 1196, 1204 (Fla. 2004). Proportionality review "is not a comparison between the number of aggravating and mitigating circumstances." Crook v. State, 908 So. 2d 350, 356 (Fla. 2005) (quoting Porter v. State, 564 So. 2d 1060, 1064 (Fla. 1990)). Instead,

- 38 -

we must consider the totality of the circumstances in comparison to other cases where the death sentence has been upheld to determine if death is warranted. Davis v. State, 859 So. 2d 465, 480 (Fla. 2003).

The instant case involves a murder by stabbing as well as two counts of attempted first-degree murder, two counts of armed kidnapping, armed burglary, armed robbery, and arson. The jury recommended death by a vote of twelve to zero. The trial court found five aggravating circumstances beyond a reasonable doubt: (1) committed by a person previously convicted of a violent felony (great weight); (2) committed while engaged in the commission of armed kidnapping and arson (great weight); (3) committed for pecuniary gain (great weight); (4) especially heinous, atrocious, or cruel (HAC) (great weight); and (5) committed in a cold, calculated, and premeditated manner (CCP) (great weight). The trial court found eight mitigating circumstances: (1) no significant history of prior criminal activity (very little weight); (2) Tundidor had a chaotic and dysfunctional family upbringing and was physically and verbally abused by his father (little weight); (3) Tundidor was forced to quit school at an early age (very little weight); (4) Tundidor suffered from physical injuries as well as pain (very little weight); (5) Tundidor was gainfully employed and operated a successful business (minimal weight); (6) Tundidor was a Red Cross volunteer and did volunteer work for his church (very little weight); (7) Tundidor was well-behaved in jail while awaiting

trial (slight weight); and (8) Tundidor has maintained positive relationships (minimal weight).

Under the totality of the circumstances, Tundidor's sentence is proportional in relation to other death sentences that this Court has upheld. See, e.g., Gosciminski, 132 So. 3d at 716–17 (holding death sentence proportionate for stabbing murder during burglary where trial court found three aggravators, including HAC and CCP, one statutory mitigator of "no significant history of criminal activity," and 13 nonstatutory mitigators); Kocaker v. State, 119 So. 3d 1214, 1226, 1232 (Fla. 2013) (holding death sentence proportionate for stabbing death of cab driver where trial court found prior violent felonies); Banks v. State, 46 So. 3d 989, 993, 1000–01 (Fla. 2010) (holding death sentence proportionate for stabbing murder and stealing a car where trial court found HAC, CCP, and prior violent felony aggravators as well as low IQ and brain deficits mitigators); Merck v. State, 975 So. 2d 1054, 1066–67 (Fla. 2007) (holding death sentence proportionate for stabbing murder where trial court found prior violent felony and HAC aggravators, statutory age mitigator and several nonstatutory mitigators, including a difficult family background, alcohol use the night of the murder, and capacity to form positive relationships); Blackwood v. State, 777 So. 2d 399, 405, 412–13 (Fla. 2000) (holding death sentence proportionate for strangulation murder

where trial court found HAC aggravator, one statutory mitigator, and eight nonstatutory mitigators). Accordingly, Tundidor's death sentence is proportional.

### III. SUFFICIENCY

Finally, "[i]n appeals where the death penalty has been imposed, this Court independently reviews the record to confirm that the jury's verdict is supported by competent, substantial evidence." Davis v. State, 2 So. 3d 952, 966–67 (Fla. 2008). Applying this standard, we conclude that competent substantial evidence supports Tundidor's conviction for first-degree murder.

As explained above, Junior testified that Tundidor asked him to help him scare his landlord. Junior testified that Tundidor brought a gun and a seven- or eight-inch-long bowie knife with him to the Morrisseys'. Tundidor instructed Junior to enter the Morrisseys' house and restrain them. Junior testified that once the Morrisseys were restrained, Tundidor entered the house to give further instructions and look for valuables. Then Tundidor instructed Junior to take the Morrisseys to an ATM to withdraw money. Junior testified that once Junior returned with $500 from the ATM, Junior restrained the Morrisseys a second time, and Tundidor reentered the house at that time. Junior testified that Tundidor took laptops from the Morrisseys' home. He then instructed Junior to bring Joseph to him. Junior also testified that Tundidor attempted to shoot Joseph, but the gun jammed. At that point, Tundidor retrieved the bowie knife. Junior testified that

Tundidor then proceeded to stab Joseph nine times.  Finally, Tundidor instructed Junior to help him set the house on fire, leaving Linda bound in the master bedroom with her five-year-old son.

Additionally, Hilda, Tundidor's fiancée, testified that when she went to Tundidor's business on April 6, 2010, she noticed a large bowie knife was missing and she smelled gasoline and a burning odor.  She testified that she also saw burn marks in the bathroom and a pile of ashes that looked like pieces of clothing.  Hilda also testified that Tundidor asked her to get rid of his silver and black gun, and when she refused, Tundidor yelled, "[Y]ou want me to go to jail?"

Shawn testified that when he asked Tundidor about seeing the Morrisseys on the morning news, Tundidor said:  "Nobody f***s with [Tundidor] and gets away with it."  Shawn testified that when he went to work at Tundidor's business, he noticed that the large bowie knife was missing and found ash, clothing pieces, and other material outside near the garage door.  Also, Shawn testified that after Junior was arrested, Tundidor told him that Junior had not known that Joseph was going to die, and Junior only knew they were going to rob the Morrisseys and that he would get money for crack cocaine.  Shawn also testified that Tundidor told Shawn that Shawn's shoes "were not white when [Tundidor] was done with them."  Furthermore, there was evidence recovered from the search of Tundidor's

business. For example, the police found zip ties similar to those used to bind the Morrisseys, a set of walkie-talkies, and euros in the garbage can.

Accordingly, we find that there is sufficient evidence to support the first-degree murder conviction.

## IV.  CONCLUSION

For the reasons expressed above, we vacate the two convictions of attempted felony murder, deny all other claims raised on appeal, and affirm Tundidor's conviction for first-degree murder and sentence of death.

It is so ordered.

LEWIS, J., concurs.
LABARGA, C.J., and PARIENTE, J., concur in result.
CANADY, J., concurs specially with an opinion, in which POLSTON and LAWSON, JJ., concur.
QUINCE, J., concurs in part and dissents in part with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

CANADY, J., specially concurring.

I concur in the majority opinion in all respects except for the discussion regarding Hurst.

POLSTON and LAWSON, JJ., concur.

QUINCE, J., concurring in part and dissenting in part.

I concur with my colleagues that Tundidor is not entitled to relief on the majority of his claims; however, I cannot agree with the majority's conclusion that

- 43 -

the Hurst error in this case is harmless beyond a reasonable doubt. Because I would find that the Hurst error in this case requires a new penalty phase, I dissent.

In Hurst v. State, 202 So. 3d 40, 69 (Fla. 2016), petition for cert. filed, No. 16-998 (U.S. Feb. 13, 2017), we declined to speculate why the jurors voted the way they did; yet, here, the majority finds that the unanimous "recommendation allows us to conclude beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravators to outweigh the mitigating factors." Majority op. at 37 (quoting Davis v. State, 207 So. 3d 142, 174 (Fla. 2016)).

Although the jury unanimously recommended a death sentence, we cannot know that the jury found each aggravating factor unanimously. Because three of the aggravators found by the trial court for the murder in this case—that the capital felony was committed for pecuniary gain; that the capital felony was especially heinous, atrocious or cruel; and that the crime was committed in a cold, calculated, and premeditated manner—require specific factual findings, Hurst requires that the jury, not the trial judge, make that determination. The jury made no such determination in Tundidor's case.

By ignoring the record and concluding that all aggravators were unanimously found by the jury, the majority is engaging in the exact type of conduct the United States Supreme Court cautioned against. See Hurst v. Florida,

136 S. Ct. at 622. Because the harmless error review is neither a sufficiency of the evidence review nor "a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence," see <u>DiGuilio</u>, 491 So. 2d at 1139, I cannot conclude beyond a reasonable doubt that the error here was harmless, and I would vacate Tundidor's unconstitutional death sentence and remand for resentencing. See <u>Hurst</u>, 202 So. 3d at 69.

An Appeal from the Circuit Court in and for Broward County,
    Cynthia G. Imperato, Judge - Case No. 062010CF006496A88810

Carol Stafford Haughwout, Public Defender, and Gary Lee Caldwell, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, Florida,

    for Appellee