# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D17-754

_____

ADAM FRASCH,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____

On appeal from the Circuit Court for Leon County.
James C. Hankinson, Judge.

September 25, 2019

PER CURIAM.

A jury convicted Appellant of murdering his wife. He is serving a life sentence in prison for first-degree murder, and this is his direct appeal. He asserts the trial court reversibly erred in three respects: (1) by denying Appellant's motion for new trial without conducting an evidentiary hearing; (2) by allowing the State to introduce hearsay evidence; and (3) by denying Appellant's motion to withdraw a formerly-exercised peremptory challenge. After careful consideration, we reject Appellant's arguments and affirm his judgment and sentence.[1]

_____

[1] Judge Winokur was substituted on the panel after Judge Winsor was appointed to the federal bench, and has viewed the oral argument video.

(1) Denial of Motion for New Trial.

We review the trial court's ruling on the new-trial motion for abuse of discretion. *Tunidor v. State*, 221 So. 3d 587, 603 (Fla. 2017). "In order to demonstrate abuse, the nonprevailing party must establish that no reasonable person would take the view adopted by the trial court." *Id.* (quoting *Stephens v. State*, 787 So. 2d 747, 754 (Fla. 2001)).

Appellant alleged a *Brady*[2] violation as grounds for a new trial. To establish a *Brady* violation, Appellant had to show the evidence was favorable to him, either because it was exculpatory or because it was impeaching; the State suppressed the evidence, either willfully or inadvertently; and prejudice resulted. *Floyd v. State*, 902 So. 2d 775, 779 (Fla. 2005) (citing *Carroll v. State*, 815 So. 2d 601, 619 (Fla. 2002)). The alleged *Brady* violation involved a statement purported to be from the victim's family, apparently in Madagascar, the victim's home country. Evidence at trial indicated that the victim had no family in the United States, and that her family had never visited her here. At sentencing, the prosecutor explained that the family statement was unsigned, had been roughly translated from the original language, and the family wanted it to be read at sentencing. Without objection or comment from the defense, the prosecutor read the statement into the record, as follows:

> For us, the Frasch – well, it says, For us, the Samira family [referencing the victim's first name], we hold [Appellant] responsible for the death of Samira. According to Samira, she was very afraid that [Appellant] would hurt her, because she had noticed the presence of someone prowling in their home nights before his (sic) death.
>
> As [Appellant] came to see the house, certainly she had to tell him her fears. So, why did [Appellant] not do

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963) (recognizing prosecutors' obligation to disclose material evidence).

2

anything to avoid the worst? At least he would have checked the surveillance cameras in their home.

Why was Samira not with him on the day of her death when they went to the beach? Samira would not have accepted that [Appellant] was busy. We all know that [Appellant] had abducted their two girls and left with his mistress, so why the day of her death did [Appellant] supposedly meet [the mother of one of his other children] en route before going to the beach?

Samira's body was found in the pool. Certainly, it does not – it was not there to swim that day if she would part with her children and her husband at the beach. Why did [Appellant] rush to cremate the body of Samira?

There are so many that lead us to say that [Appellant] is responsible for the murder of Samira. Whether he murdered her or he is the sponsor. And we are certain that he could never take care of the two daughters he had with Samira.

Appellant argued below that he was entitled to an evidentiary hearing on his *Brady* claim. He argued that the family statement should have been disclosed, was favorable to him and would have resulted in a different verdict, he could not have discovered it earlier, and he was prejudiced by not having received it. The trial court declined to hold an evidentiary hearing, explaining its ruling as follows:

The defense cites to an offhand comment in a very confused, rambling dissertation from some "family member." This statement was a rough translation. It is unlikely that the "family member" even resides in the United States and, therefore, is not even available to be subpoenaed. There is nothing suggesting there is undisclosed information that would have resulted in a different verdict.

Appellant argues that the family statement might have been mis-translated, and that it is not clear who wrote it or where the author(s) lived. His primary substantive claim is that if he could

have investigated the reference to a prowler in the marital home, he could have developed an argument that someone else murdered the victim.

We conclude that the trial court did not abuse its discretion in rejecting Appellant's arguments. The unanswered questions about the family statement leave it worthless as evidence or as a source of evidence. Appellant does not argue that he definitely or even likely could have found answers to all of the unknowns about the statement, nor that those answers would favor him. The statement is not favorable to Appellant, as it clearly blames him for the victim's death and asserts that the victim was afraid of him primarily, not of a prowler.

Appellant's claim that he could have developed an unknown prowler as the real killer is speculative, and he could have discovered any video evidence earlier. If the marital home had a video security system, as the statement indicates and as would be expected in the high-end home of a very wealthy family in a high-end, gated subdivision, Appellant as owner and former occupant of that home would have known that all along, and could have obtained any relevant surveillance footage and images in the course of preparing his defense. What he might have obtained would not necessarily have benefited him. Further, at trial, Appellant did argue that someone else killed the victim, including a landscaper who discovered the victim's body and incorrectly testified that he was at the house with the victim and children the day before the murder. Appellant also argued at trial that because doors to the home were found to be unlocked on the morning the victim's body was discovered, someone else could have accessed the house and the victim. The jury rejected his arguments, as did the trial court. We find that the trial court did not abuse its discretion in rejecting this argument for a new trial.

(2) Admission of Evidence.

We review a trial court's ruling on the admissibility of evidence for abuse of discretion, but whether a statement falls within the statutory definition of hearsay is a question of law reviewed de novo. *Powell v. State*, 99 So. 3d 570, 573 (Fla. 1st DCA 2012).

4

The trial court allowed the State to introduce testimony of the victim's personal assistant, who claimed that he heard a heated conversation that the victim put on speakerphone. He heard the victim say to the other person, "You are my husband"; and heard the other person say, "I will kill you." Appellant argues, as he did below, that the witness's identification of Appellant as the other person on the phone was hearsay because it was introduced for the truth of the assertion; and that the death threat, even if an admission under section 90.803(18) of the Florida Statutes, was predicated on the inadmissible hearsay, and thus both statements should have been excluded.

The trial court rejected both parts of Appellant's argument. The court ruled that "You are my husband" was not hearsay because it was not being offered for the truth of the matter asserted—that is, not to establish marital status—but rather as evidence of the identity of the other person. Even if that ruling was erroneous, however, we reject the argument that it entitles Appellant to a new trial. The victim's assertion, in context, would be expected to draw a denial if it were not true, and the other speaker's failure to deny being the victim's husband can be deemed an adoptive admission by Appellant. *See Hernandez v. State*, 979 So. 2d 1013, 1016–17 (Fla. 3d DCA 2008) (relying on *Globe v. State*, 877 So. 2d 663, 672-73 (Fla. 2004), for rule that another individual's statements are admissible as defendant's adoptive admissions where the context indicates defendant could have been expected to deny the statements if they were untrue).

More importantly, taken in full context, we cannot conclude that any error was prejudicial. *See State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986) ("The harmless error test . . . places the burden on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict, or, alternatively stated, that there is no reasonably possibility that the error contributed to the conviction."). The victim's statement that "You are my husband" was not the only indicator that Appellant was the other person on the call. The witness also testified that the nature of the entire conversation supported the conclusion that it was between the victim and Appellant. Defense counsel impeached this witness by eliciting his admissions that he had only worked for the victim for about two

weeks and had never seen or heard Appellant. The jury was free to accept or reject the testimony.

Appellant cannot demonstrate that this testimony alone made any difference in the outcome of his trial. Substantial additional evidence supported the verdict, including, but not limited to, the following. The parties had a tumultuous and even violent relationship, which Appellant did not dispute; he admitted they fought frequently. The victim had obtained a domestic-violence injunction against Appellant, and had recently been awarded the primary marital house and custody of the children in contentious divorce proceedings. Appellant also admitted they had argued the night before the murder. This was substantiated by video recorded outside a car service location where the couple stopped to pick up the victim's vehicle after having spent the day visiting multiple additional homes owned by Appellant so the victim could determine whether any of Appellant's girlfriends had disturbed or taken the victim's belongings. Video from the subdivision entry gate then showed Appellant's car following the victim's car into the neighborhood late on the night before the murder. Appellant admitted the couple had spent most of the night fighting, including about other women. The subdivision gate video then showed Appellant's car leaving a few hours before the victim's body was found.

The victim's dead body was found at the bottom of the marital home's swimming pool. Even Appellant admitted the victim could not swim. She had significant blunt trauma injuries to her head and a massive skull fracture, which the medical examiner testified could not have come from tripping and falling, nor from a single blow with a fist. The victim also had bruising on her arms and hands. Appellant was much larger than the victim, and had been training as a boxer for several months before the murder. Appellant's DNA was under the victim's fingernails. Appellant had a fresh scratch on his face the day of the murder, and injuries to his hands. He claimed at first that the victim had been drinking heavily that night, but toxicology results showed that claim to have been a complete lie. The autopsy indicated the victim was alive, but likely incapacitated from her head injuries, when her body entered the pool.

6

In addition, Appellant's cellmate—whom the defense impeached with evidence of some forty prior felony convictions—testified that Appellant admitted to the killing and provided details consistent with the evidence. Specifically, the cellmate testified that Appellant said he hit the victim with a golf club and threw her in the pool. The victim's DNA was found on a golf club at the home.

The jury also heard substantial evidence of Appellant's post-murder actions that would support a guilty verdict. At 7:30 the morning of the murder, a neighbor heard a car alarm go off at the Frasch home and saw someone in a red shirt loading up the back of a dark SUV—the type and coloring of Appellant's vehicle. The subdivision gate video showed a vehicle matching the appearance of Appellant's car leaving at 8:00 the morning of the murder. Appellant admitted he took the two children, of whom he did not have custody, to Panama City the morning of the murder. After a friend called and told Appellant that the victim had been found dead in the pool, Appellant left voice mails for the victim asking her to call him—but he did not call law enforcement, start back to Tallahassee, or otherwise attempt to confirm her status. Also after having been told that his wife was dead, Appellant called a man who performed maintenance on one of Appellant's boats in south Florida and said that "a serious problem" had come up. While being interviewed by law enforcement later that same day, Appellant knew and related details about the scene around the pool that could not have occurred until immediately before the victim's death, and that law enforcement had not told him.

It was for the jury to weigh all of this evidence of Appellant's guilt, which was voluminous and from multiple sources. As such, even if the personal assistant's testimony about specific words spoken on one phone call was improperly admitted, any error was harmless.

(3) Denial of Belated Withdrawal of Peremptory Challenge.

We review for abuse of discretion the trial court's denial of a motion to withdraw a formerly-exercised peremptory strike. *McCray v. State*, 220 So. 3d 1119, 1122 (Fla. 2017). The Florida Supreme Court in *McCray* rejected a blanket rule prohibiting a belated withdrawal of a peremptory challenge, recognizing that it

7

may be appropriate in "rare circumstances." *Id.* at 1126 ("[T]here may be rare circumstances where the withdrawal of a peremptory challenge after the party has exhausted all peremptory challenges may be appropriate."). The court also recognized the potential of misusing this "rare" possibility for improper gamesmanship. *Id.*

On the facts of this case, we conclude the trial court did not abuse its discretion. The defense used the sixth of its ten peremptory strikes against a prospective juror. Jury selection continued until five jurors had been selected. The defense then asked the trial court to allow it to withdraw its strike of the earlier juror, and instead use that strike against a new prospective juror, which would have made the earlier juror the sixth and final juror other than alternates. The trial court asked the defense for an explanation, noting that the belated withdrawal would deprive the prosecution of its ability to exercise strategic decisions on jurors already seated. Defense counsel argued that he had erroneously thought the earlier juror had previously served on a jury and struck her for that reason, but it turned out he was mistaken. The prosecutor undermined that stated defense rationale, pointing out that two other jurors whom the defense had accepted had previously served on juries. The trial court declined to allow the belated back-strike, reasoning as follows:

> [T]he problem is it changes the strategy significantly. I mean, if it was just the last strike, there's no question I would let you go back and change, but to let it go as far as we did and then change. ... I'm not going to allow you to withdraw your strike. I just think it's so late in the game. I know how attorneys try to develop a game plan down the road and I would just be letting you change the game plan. I just – I don't think that would be fair. I'm not aware of any law on the subject, one way or another, so I'm not going to allow you to withdraw the strike at this point in time.

The trial court researched the issue during a subsequent break, and advised the parties that the ruling was left to the court's discretion based on the Fourth District's decision in *McCray v. State*, 199 So. 3d 1006 (Fla. 4th DCA 2016). Although the Florida Supreme Court rendered its decision after trial rejecting the

blanket-rule approach of the Fourth District's *McCray* decision, the supreme court continued to embrace an abuse of discretion standard for this issue. 220 So. 3d at 1122. On the facts presented, and for the reasons the trial judge explained, we find no abuse of discretion.

AFFIRMED.

ROBERTS, KELSEY, and WINOKUR, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

Michael Ufferman of Michael Ufferman Law Firm, P.A., Tallahassee, for Appellant.

Ashley Moody, Attorney General; and Virginia Chester Harris, Assistant Attorney General, Tallahassee, for Appellee.