# Supreme Court of Florida

————

No. SC20-1741

————

**MARLIN L. JOSEPH,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

February 10, 2022

PER CURIAM.

Marlin Joseph appeals two first-degree murder convictions and two corresponding sentences of death.[1] For the reasons explained below, we affirm Joseph's convictions and sentences of death.

## I. BACKGROUND

On January 18, 2018, Marlin Joseph was indicted for two counts of first-degree murder with a firearm related to the deaths of

———————

1. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.

Kaladaa Crowell and her 11-year-old daughter, Kyra Inglett.[2] The incident in this case occurred on December 28, 2017. The evidence presented at trial established that at that time, Joseph resided in a home in West Palm Beach with his mother, Robin Denson; Denson's girlfriend, Crowell; Crowell's daughter, Kyra; and Joseph's three brothers, Parice Joseph, Patrick Joseph, and Cordarius Joseph.[3] Also staying at the home at the time was Joseph's eight-year-old daughter, Kamare Canty, and Jeshema Tarver, Denson's goddaughter.

Earlier in the day, an incident occurred between Kyra and Kamare. Kamare asked Kyra and Jeshema to sit on her back because it was hurting. Kamare then told Kyra and Jeshema to get off her back because they were hurting her, but Kyra had trouble getting off Kamare. Jeshema testified at trial that another incident had occurred on December 23, 2017 (two days before Christmas and five days before the shootings), and she heard Joseph yelling to

_____

2. Joseph was also indicted for felon in possession of a firearm, which charge was bifurcated for trial.

3. For clarity, Marlin Joseph's brothers will be referred to by their first names because they share the same last name as Joseph.

Denson about Kyra saying she "ha[d] one more time to make [him] mad or to bother, she needs to leave my daughter alone."

Later in the day on December 28, 2017, Parice and Patrick picked Denson up at the end of her workday, and Denson went grocery shopping before returning home. Present in the home when they arrived were Joseph, Crowell, Kyra, Kamare, Cordarius, and Jeshema. Joseph helped bring in the groceries and then was reading his Bible in the room he shared with Patrick, and Cordarius and the girls (Kamare, Kyra, and Jeshema) were sitting on the couch in the living room. The girls were laughing, talking, and on their phones. Crowell was folding clothes in the room she shared with Denson. After Denson arrived home, she had a conversation with Joseph in the living room area about a text message he received from Crowell, who was still in her room. During this conversation, Joseph brought up Kamare's mother asking whether she was coming to pick Kamare up. Denson testified that Joseph was not upset but was being disrespectful about Kamare's mother. Joseph started using expletives in reference to Kamare's mother, and Denson told him to calm down because she did not want the kids to hear that kind of language. After the conversation with

Joseph, Denson walked outside to the porch where Parice and Cordarius were. Cordarius was outside the home waiting for his girlfriend to pick him up. Denson took Cordarius aside, and they went to the sidewalk in front of the home while Parice stayed on the porch.

Jeshema went to take a shower, and she heard arguing between Joseph and Crowell. Jeshema heard Joseph say to Crowell, "Why is your daughter [Kyra] being mean to my daughter [Kamare], she didn't do anything wrong." Jeshema exited the shower after hearing three loud bangs. She heard Crowell screaming and crying, asking for someone to call 911. Jeshema then heard another bang. She opened the bathroom door, and Kamare told her Crowell and Kyra had been shot. Jeshema walked out to blood all over the floor and Crowell flat on her face. Jeshema and Kamare went into Kyra's room and hid under the bed. Kamare called 911 using Joseph's phone.

Parice heard gunshots while sitting on the front porch. He saw Kyra run outside, looking backwards. Joseph came outside after Kyra. Parice tackled Joseph because he was scared after hearing the gunshots. Parice saw Joseph with a gun in his hand.

Parice attempted to get the gun from Joseph but was unsuccessful. Parice saw Joseph run back into the home while Kyra was lying on the walkway. Parice ran to go check on Denson and Cordarius down the street. Joseph exited the home again and drove off in Crowell's car. Parice testified at trial that he did not see anyone shoot Crowell or Kyra, but he also saw Joseph with a gun a couple of days prior. Besides Joseph, Parice did not see anyone else with a gun.

While outside, Denson and Cordarius also heard gunshots coming from inside the home, and Cordarius told Denson to run. Cordarius saw Kyra come outside and fall to the ground. Cordarius did not see Joseph chasing Kyra. Denson ended up on the ground in her neighbor's yard; Patrick later picked her up off the ground. Patrick was crying and told Denson that Crowell had been shot. Denson went to the front of the home and saw Kyra on the sidewalk. Kyra was not moving but was breathing. Denson ran inside with Parice and saw Crowell on the floor in between the living room and dining room area. Denson checked for a pulse, but Crowell was unresponsive. Denson did not see Parice, Patrick, or

Cordarius with a gun. She also did not see Joseph with a gun and did not see him at all during the incident.

Joseph was the only person not at the scene when police arrived. Officer Ryan Forbes, the first responding officer, arrived at the scene and saw Kyra on the sidewalk with a gunshot wound to her head. She was breathing but would not talk back to him. Officer Forbes went inside to find a lifeless Crowell on the ground. Unlike Crowell, Kyra showed signs of life when police and medical personnel arrived—she had a pulse and was breathing. Kyra was transported to the hospital but died hours later. She never regained consciousness from the time police found her at the crime scene to when she died. Crowell and Kyra each died from gunshot wounds. Five spent cartridge casings were found outside the home, and four spent casings were found inside the home. The State's firearms expert opined that the casings were fired from the same firearm. A firearm was never found.

The medical examiner testified concerning his autopsies of Crowell and Kyra. Crowell sustained several gunshot wounds to various parts of her body—the back of her right hand (defensive wound), her belly, left calf, chest, the back of her head, and

forehead. The wound to Crowell's forehead was fatal; the bullet broke her skull and destroyed her brain. Kyra also sustained several gunshot wounds to various parts of her body—left buttock, lower back, the side of her head, and the back of her head. The wound to the back of Kyra's head was fatal; the bullet entered the back of her head and exited her forehead, damaging her skull and brain.

Later that night, Denson, Parice, Patrick, and Cordarius went to the police station to give statements. Detective Paul Creelman, the lead detective in this case, interviewed Denson, Parice, and Cordarius; and Parice and Cordarius identified Joseph as the shooter. Joseph's family members recanted in their trial testimony regarding their prior statements to the police. However, the State introduced Parice's and Cordarius' identifications of Joseph as the shooter through Detective Creelman's testimony. Specifically, Detective Creelman testified, "Cordarius told me that his brother, Marlin Joseph, had shot Kyra." Detective Creelman also testified that "Parice told me his brother, Marlin Joseph," was the shooter. Joseph was later found in Lake Worth and taken into custody on January 2, 2018.

On February 24, 2020, a jury found Joseph guilty of first-degree murder with a firearm on both counts. The penalty phase of the trial began the same day with the same jury. The State presented two witnesses—Joseph's then-probation officer and a latent print examiner. Through these witnesses, the State introduced evidence of Joseph's prior conviction for battery on a child. The defense called 15 witnesses, most of whom were lay witnesses.

On February 26, 2020, the jury rendered unanimous verdicts recommending a penalty of death on both counts of first-degree murder with a firearm, determining the aggravating factors outweighed the mitigating circumstances. The jury found that the State had established beyond a reasonable doubt the existence of the following aggravating factors: (1) Joseph was previously convicted of a felony and was on felony probation; (2) Joseph was previously convicted of another capital felony or a felony involving the use or threat of violence to another person; (3) the first-degree murder was especially heinous, atrocious, or cruel (HAC); and (4) the first-degree murder was committed in a cold, calculated, and premeditated (CCP) manner. As to Kyra, the jury also found a fifth

- 8 -

aggravator—the victim was a person less than 12 years of age.  The jury found no mitigating circumstances.

A *Spencer*[4] hearing was held on October 16, 2020, and sentencing occurred on November 19, 2020.  The trial court followed the jury's recommendation and sentenced Joseph to death.  The trial court found four aggravating factors that applied to both counts: (1) Joseph was previously convicted of a felony and under sentence of imprisonment or on felony probation (moderate weight); (2) Joseph was previously convicted of another capital felony or a felony involving the use or threat of violence (great weight); (3) the first-degree murder was especially heinous, atrocious, or cruel (great weight); and (4) the first-degree murder was committed in a cold, calculated, and premeditated manner (great weight).  The trial court found an additional aggravator for the charge related to Kyra—the victim of the first-degree murder was a person less than 12 years of age (great weight).

The trial court considered and found as proven one of the three statutory mitigators proffered by Joseph—Joseph had no

---

4.  *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

significant history of prior criminal activity (little weight). The trial court further found seven nonstatutory mitigators: (1) Joseph's family background (little weight); (2) Joseph was a good employee with an excellent work ethic as well as a talented football player who exhibited this work ethic on and off the field (little weight); (3) Joseph was a caring and attentive parent (moderate weight); (4) Joseph had the support of his family (little weight); (5) Joseph regularly attended church and was a devout Christian (little weight); (6) Joseph suffered from a delusional disorder of a persecutory type (little weight); and (7) Joseph had a low IQ (little weight).

## II. ANALYSIS

In this direct appeal, Joseph raises the following 15 claims: (1) the trial court's denial of a motion to exclude witness testimony; (2) the State's impeachment of its own witnesses; (3) the admission of out-of-court statements identifying Joseph as the shooter; (4) the admission of testimony concerning a statement Joseph made to his mother about one of the victims; (5) the trial court's denial of a motion to dismiss charges; (6) the trial court's denial of a motion to interview jurors; (7) the constitutionality of Florida's death penalty

scheme in light of this Court's decision in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020); (8) the trial court's imposition of the death penalty without finding beyond a reasonable doubt that the aggravating factors were sufficient to justify death and outweighed the mitigating circumstances; (9) the trial court's finding of HAC; (10) the trial court's finding of CCP; (11) the proportionality of Joseph's death sentence; (12) the constitutionality of Florida's death penalty statute; (13) improper prosecutorial comments during penalty-phase closing argument; (14) the alleged failure of the jury to follow the law in the penalty phase; and (15) cumulative error. This Court also considers (16) whether there is sufficient evidence to support Joseph's two murder convictions.[5]

---

5. We do not further address Claims 8 and 12 because we have repeatedly rejected these arguments. *See Bush v. State*, 295 So. 3d 179, 214 (Fla. 2020) (concluding that the defendant was not entitled to relief on his claim that Florida's death penalty statute is unconstitutional because it does not sufficiently narrow the class of individuals eligible to receive the death penalty); *Newberry v. State*, 288 So. 3d 1040, 1047 (Fla. 2019) (citing *Rogers v. State*, 285 So. 3d 872, 878-79 (Fla. 2019)); *see also Rogers*, 285 So. 3d at 886 (holding that "the sufficiency and weight of the aggravating factors and the final recommendation of death" are not elements and "are not subject to the beyond a reasonable doubt standard of proof"). Further, as to Claims 7 and 11, we do not review the proportionality of Joseph's sentence of death. *See Lawrence v. State*, 308 So. 3d

### A. Motion to Exclude Witness Testimony (Claim 1)

Joseph first argues that the trial court erroneously denied his motion to exclude the testimony of the State's firearms witness, Omar Felix. Joseph's motion was based on an alleged discovery violation due to the expert witness being disclosed the day before trial. Because the trial court properly conducted a *Richardson*[6] inquiry and its actions pursuant to that inquiry were proper, we conclude that the trial court did not abuse its discretion in denying Joseph's motion to exclude.[7]

On February 13, 2020, the day before trial, the State filed a supplemental witness list naming Omar Felix, a firearms expert, as an expert witness. The State also filed a firearms report as supplemental discovery. The report indicated that nine 9mm Luger caliber Winchester cartridge cases had been submitted to Felix for

544, 551-52 (Fla. 2020) (receding from the judge-made requirement to review the comparative proportionality of death sentences).

6. *Richardson v. State*, 246 So. 2d 771 (Fla. 1971).

7. We review a trial court's ruling on a motion in limine for an abuse of discretion. *Patrick v. State*, 104 So. 3d 1046, 1056 (Fla. 2012).

forensic analysis.  The report's conclusion was that the cartridge cases were identified to have come from the same unknown firearm.

The first day of jury selection, Joseph filed a motion to exclude, specifically seeking to exclude Felix from testifying because of the State's discovery violation and resulting prejudice to him. During jury selection, Joseph brought the motion to the trial court's attention, arguing that a *Richardson* hearing needed to be held and that he was prejudiced by the late discovery.  Joseph moved for the appointment of a firearms expert, and the trial court granted Joseph's motion.  Joseph also deposed Felix during this time.  After the jury had been sworn but before opening statements, the trial court held a hearing on Joseph's motion to exclude.  The following exchange occurred:

> [**DEFENSE COUNSEL**]:  . . . I got a firearms expert approved, we did JAC stuff, you issued an order allowing me to get a firearms expert and I got a firearms expert and we sent him the report and the firearms expert said you don't need an firearms expert.  This is not firearms, this is tool mark identification.
> . . . .
> **THE COURT**:  So your firearm expert is not an expert in tool markings as well.
> . . . .
> [**DEFENSE COUNSEL**]:  We were told that the firearms expert is not a tool mark expert.  A firearms expert can be a tool mark expert but not visa versa, and

our firearms expert was not a tool mark expert and we can't find any tool mark expert --

      **THE COURT**:  Do you want to use Mr. Omar Felix?

      [**DEFENSE COUNSEL**]:  No, I do not want to use Mr. Omar Felix.  Although he seems a very nice man, I want to tear him apart if he goes to trial if this doesn't get granted.  So, what I did was I had my investigator call the JAC and see whether or not we can find, they have a list of tool mark experts.  They don't.

      **THE COURT**:  Okay.

      [**DEFENSE COUNSEL**]:  He contacted somebody in Orlando who used to be a tool mark expert who is retired and is far, far away and never coming back to a courtroom and said he does not know of any tool mark experts in Florida or anywhere.  So I can't find a tool mark expert, and the question here, no where up to the 13th, which is the day before we started jury selection, was there anything about a firearms expert, anything about tool marks, anything about anything.  I took it upon myself to attempt to find out what I needed to know about a tool mark expert to properly prepare . . . .

The trial court then went on to conduct a *Richardson* inquiry.  The State explained why it did not turn over the evidence until the day before trial:

> What happened is Detective Creelman and myself, we were going through the evidence.  I asked Detective Creelman, who was the lead detective in this case, I said where is my firearms report?  And he said, this would have been after hours on the 12th of this month.  And he said, well, I'm not at the office but when I get back 8:30 the following day, which would have been the 13th, he said it's on the server, I'll get it to you and send it to [you] from the server, and that morning at about 8:35 I received an email from him, or a text, indicating that he thought that he had sent the casings over, he realized

that he had forgotten, he thought he had sent them over earlier. I said, well, can you get, can you contact PBSO Lab and see if they can get them done today. He retrieved the evidence from West Palm Beach Police Department's evidence department and he went over to PBSO lab and contacted, I believe it was Mr. Yateman, it went up the chain to see if they would be able to examine the casings the same day and get a report the same day, and because we didn't have a gun, because we don't have a gun, Judge, he said all this entails is me looking at all nine casings.

. . . .

And see if they were fired from the same gun, so yes, I'm able to do it today. And I put them on notice that same day.

The trial court found that a *Richardson* violation occurred but that it was inadvertent, noting that the State turned the evidence over as soon as it knew about it. The trial court then said it needed to decide whether the violation was trivial or substantial but did not make an express finding. The trial court asked the State why the violation would not prejudice Joseph. The following exchange occurred:

[**STATE**]: These casings have been in evidence since the date the homicide occurred, Judge, and the Defense was aware that they were in evidence that date. They have been aware all along that there has never been a gun located in this case. Realistically, Judge, if there was some concern about whether or not nine shell casings that were collected were all fired by the same gun, they had an opportunity to retain a tool expert or a firearms expert to determine, well, first of all, do these

- 15 -

casings even match?  So it's not that it's, it's new evidence, Judge, that I just realized is related to the case. They've been, they were collected on the same day as the homicides, so they were on notice that these casings were in evidence so this is not something that's new.  The only thing that is new is they were examined on the 13th.

**THE COURT**:  And that they potentially were fired from the same versus a different gun.

[**STATE**]:  And, I'm sorry, yes, Judge, and that they were potentially fired from the same gun.

**THE COURT**:  I think that's his -- all right.  Is there any other evidence in the case to suggest there may have been multiple guns?

[**STATE**]:  No, not from the State, Judge.

**THE COURT**:  Okay.  And all of, from all of your witnesses is there any indication that --

[**STATE**]:  I can tell you, Judge, that based on what I anticipate the witnesses are going to say, that there was one gun that was seen in this defendant's hand when he shot Kaladaa Crowell and Kyra Inglett.  There was one gun.  I do not anticipate, based on what I know from interviewing these witnesses, based on their statements to the police right after this happened, there wasn't some other person who was unrelated to the family members that was on the property.  The defendant was the one that was seen with the gun and one gun.

**THE COURT**:  All right.  And after the shots were fired, are there any witness testimony or any evidence to indicate that another gun was ever used or shot or fired around the same time?

[**STATE**]:  No, Your Honor.

**THE COURT**:  Okay.  So the other evidence seems to suggest that there was only one gun used in both of these homicides.

[**STATE**]:  Yes, Judge.

**THE COURT**:  Okay.  So all of, all what this does is confirm witness testimony.

[**STATE**]:  That's exactly what it does, yes.

**THE COURT**: Okay. So let me turn to the Defense. What is the prejudicial effect? How did this impact your ability to prepare for trial?

. . . .

[**DEFENSE COUNSEL**]: What if my firearms expert who examines it says, no, they weren't from the same gun. What the Court's asking me to do is accept their firearms expert as being correct. That's why I asked for an expert to try to analyze it. I will tell the Court that on December 20th, 2019, we went down to the West Palm Beach Police Department and looked at all of the evidence, and at that point we saw that there were search warrants for the laptops or whatever they were, at which point we asked about it in court and the State gave us the contents of it. I don't believe it's my responsibility to ask the State why they didn't test their evidence.

. . . .

Your Honor, what the State has just confirmed is that they want this evidence to confirm their other evidence, which is clearly highly prejudicial to me because if I knew they were going to do that, I would have done something beforehand and if I got an expert that said, yep, they're the same --

**THE COURT**: Does it change the theory of your case? The theory of your Defense?

[**DEFENSE COUNSEL**]: Your Honor, yeah, yes, it would, Your Honor.

**THE COURT**: How so?

. . . .

[**DEFENSE COUNSEL**]: Your Honor, I'm not agreeing with the State's facts of how many shooters there was who did the shooting.

The trial court denied the motion to exclude, finding the

*Richardson* violation did not prejudice Joseph's trial preparation.

The trial court indicated that Felix's testimony would only

- 17 -

corroborate expected witness testimony.  The trial court also stated that it would give the defense time to find an expert and would make accommodations, noting that it could not imagine the defense would be unable to find an expert in two weeks.

At trial, before the State called Felix to the stand, defense counsel told the trial court that the defense still had not found a tool mark expert.  Defense counsel renewed the defendant's objection and asked the trial court to exclude Felix as a witness.  The trial court overruled the objection.  The trial court then reiterated its ruling from the *Richardson* hearing.  Felix went on to testify that the casings were fired from the same unknown firearm.  Joseph cross-examined Felix extensively.  During this cross-examination, Felix was asked about a database known as the National Integrated Ballistic Information Network.  The trial court cut off this line of questioning, finding it not relevant, and asked defense counsel to move on.

"A *Richardson* hearing is required when there is a *possible* discovery violation in order to flesh out whether there has indeed been a discovery violation." *Landry v. State,* 931 So. 2d 1063, 1065 (Fla. 4th DCA 2006).  "Where exclusion of evidence . . . is sought

because of a discovery violation, *Richardson* holds that the trial court's discretion can be properly exercised only after an adequate inquiry is made into three areas: (1) whether the discovery violation was willful or inadvertent; (2) whether it was trivial or substantial; and (3) whether it had a prejudicial effect on the opposing party's trial preparation." *McDuffie v. State*, 970 So. 2d 312, 321 (Fla. 2007). When a trial court conducts a *Richardson* hearing, "[t]his Court will review the record to determine if the inquiry was properly made and if the trial court's actions pursuant to the inquiry were proper." *Delhall v. State*, 95 So. 3d 134, 160 (Fla. 2012).

Here, the record shows that the trial court conducted an adequate *Richardson* inquiry. The trial court first determined that the State's disclosure of its firearms expert and firearms report was a discovery violation due to the State not disclosing this information until a day before trial. The trial court next determined that the State's discovery violation was inadvertent, and the record supports this finding. The State told the trial court that the cartridge casings had been in evidence since the day of the murders, but after going through the evidence with Detective Creelman on the eve of trial, it realized there was no firearms report because Detective Creelman

- 19 -

forgot to send the casings to the lab for analysis. The State had the casings analyzed the same day it discovered there was no firearms report and then filed a supplemental list of witnesses and Felix's firearms report later that day. There is no record evidence that the State willfully delayed analyzing the cartridge casings and generating a firearms report. The trial court then said it needed to determine whether the State's violation was trivial or substantial, but it did not make an explicit finding.

The trial court finally determined that the State's discovery violation did not have a prejudicial effect on Joseph's trial preparation. "Prejudice in this context means procedural prejudice significantly affecting the opposing party's preparation for trial." *McDuffie*, 970 So. 2d at 321. "[T]he defense is procedurally prejudiced if there is a reasonable possibility that the defendant's trial preparation or strategy would have been materially different had the violation not occurred." *State v. Schopp*, 653 So. 2d 1016, 1020 (Fla. 1995). "Trial preparation or strategy should be considered materially different if it reasonably could have benefited the defendant." *Id.* A court's analysis of procedural prejudice "considers how the defense might have responded had it known

about the undisclosed piece of evidence and contemplates the possibility that the defense could have acted to counter the harmful effects of the discovery violation." *Scipio v. State*, 928 So. 2d 1138, 1149 (Fla. 2006).

The trial court properly ruled that the State's discovery violation did not procedurally prejudice Joseph. The trial court first turned to the State and asked why its discovery violation would not prejudice Joseph. Once the State provided its reasons—that the cartridge casings had been in evidence since the crimes and that Felix's testimony would merely corroborate other expected testimony—the trial court then asked the defense how Felix's testimony impacted its ability to prepare for trial. Defense counsel said the defense would have retained its own firearms expert who could testify that the cartridge casings did not come from the same firearm. However, even if the defense had been able to retain their own expert to contradict Felix's testimony, there is no reasonable possibility that the defendant's trial preparation or strategy would have been materially different. Felix's testimony would not have changed the defense's theory of the case, which was that Joseph was not the shooter. Felix's testimony did not involve the identity of

the shooter; it was merely corroborative of other witness testimony. Therefore, Joseph's theory that he was not the shooter would be just as plausible after Felix's testimony as it was prior to its admission into evidence. *See Cox v. State*, 819 So. 2d 705, 713 (Fla. 2002) (concluding that the State's discovery violation did not materially hinder the defendant's trial preparation where the defense's theory of the case was just as viable after the challenged testimony as it was prior to the introduction of the testimony). There was no evidence suggesting there was more than one gun or more than one shooter involved in these crimes. The trial court also gave defense counsel time to find a firearms expert and an opportunity to depose Felix. Further, even if the trial court erroneously denied Joseph's motion to exclude, any error was harmless. *See State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986). Accordingly, we deny relief on this claim.

## B. *The State's Impeachment of its Own Witnesses (Claim 2)*

Joseph next argues that the trial court erred in allowing the State to improperly impeach its own witnesses at trial. Joseph argues that the State attempted to impeach each member of Joseph's family with purported inconsistent statements, but Joseph

fails to identify any specific instances of improper impeachment in the argument section of his initial brief. In his reply brief, Joseph identifies one instance, which we briefly address. We conclude that even if this issue has been properly presented, it is without merit.

During the trial testimony of Robin Denson (Joseph's mother), the State inquired about a conversation Denson had with Joseph immediately before the shootings. Specifically, Denson testified that she had a conversation with Joseph when she got home from work but that it was not about the incident between Kyra and Kamare. Denson further testified that Joseph was not upset and was not being disrespectful to her but towards Kamare's mother. Denson testified that she remembered going to the police station and speaking with Detective Creelman shortly after the murders. The State asked about a specific statement Denson made to Detective Creelman: "You said that Marlin [Joseph] kept going on and on." Defense counsel objected on hearsay and improper attempted impeachment grounds, arguing that a proper predicate must be laid for a prior inconsistent statement. The trial court found that the State did lay a proper predicate and overruled the objection but noted that the State needed to confront Denson with

- 23 -

the prior inconsistent statement and ask her if she ever made a different statement. The State then asked Denson whether she said something to Detective Creelman about her conversation with Joseph that was different from what she said on the stand. Denson said she was testifying as to what she remembered from over two years ago. The State then impeached Denson with her prior inconsistent statements to Detective Creelman that Joseph was upset because Kyra and Kamare got into a disagreement and was being disrespectful.

Pursuant to section 90.608, Florida Statutes (2017), "[a]ny party, including the party calling the witness, may attack the credibility of a witness." Specifically, a party may impeach a witness by "[i]ntroducing statements of the witness which are inconsistent with the witness's present testimony." § 90.608(1), Fla. Stat. In order to impeach a witness with a prior inconsistent statement, "the prior statement must be both (1) inconsistent with the witness's in-court testimony, and (2) the statement of the witness." *Wilcox v. State*, 143 So. 3d 359, 383 (Fla. 2014). Prior statements are deemed inconsistent only if they directly contradict or are materially different from testimony during trial. *Id.* "Before a

witness can be impeached with a prior inconsistent statement, the proper foundation must be laid." *Pasha v. State*, 225 So. 3d 688, 713 (Fla. 2017) (quoting *Pearce v. State*, 880 So. 2d 561, 569 (Fla. 2004)). "Prior to questioning a witness about the contents of a previous inconsistent statement, counsel must call to the witness's attention the time, place, and person to whom the statement was allegedly made." *Pearce*, 880 So. 2d at 569-70. "Further, a trial court's ruling on the admissibility of evidence will be upheld absent an abuse of discretion." *Wilcox*, 143 So. 3d at 373.

Here, contrary to Joseph's argument, Denson testified at trial inconsistent with the sworn statement she gave to the police on the night of December 28, 2017, in which she stated that Joseph was upset because Kyra and Kamare got into a disagreement and was being disrespectful. At trial, Denson denied that Joseph was upset or disrespectful during their conversation on the night of the shootings. The State also laid the proper predicate by asking Denson if she remembered giving a statement to Detective Creelman at the police station shortly after the murders before confronting

her with the statement. Accordingly, the State did not improperly impeach Denson, and we deny relief on this claim.[8]

### C. *Out-of-Court Identifications of Joseph (Claim 3)*

Joseph argues that the trial court erroneously admitted Detective Creelman's testimony regarding out-of-court statements made by Cordarius and Parice that identified Joseph as the shooter. Specifically, Joseph argues that the identifications were hearsay because Cordarius and Parice provided in-court testimony and did not testify inconsistently at trial. However, because Cordarius' and Parice's out-of-court identifications were not hearsay and were admissible as statements of identifications pursuant to section 90.801(2)(c), Florida Statutes (2017), we conclude that the trial court did not err in admitting Detective Creelman's testimony.

---

8. We also find Joseph's argument that the trial court never found the witnesses' testimony affirmatively harmful or never declared the witnesses to be adverse without merit. *See Morton v. State*, 689 So. 2d 259, 262 (Fla. 1997) ("In 1990, section 90.608 was amended to remove the necessity of showing that one's own witness had become adverse. . . . [Section 90.608] now permits a party to impeach its own witness by introducing prior inconsistent statements without regard to whether the witness's testimony is prejudicial."), *receded from on other grounds by Rodriguez v. State*, 753 So. 2d 29 (Fla. 2000).

"Admissibility of evidence is within the sound discretion of the trial court, and the trial court's ruling will not be disturbed on appellate review unless there is an abuse of discretion." *Tundidor v. State*, 221 So. 3d 587, 598 (Fla. 2017). "However, the question of whether a statement is hearsay is a matter of law and is subject to de novo review on appeal." *Id.* (quoting *Cannon v. State*, 180 So. 3d 1023, 1037 (Fla. 2015)). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." § 90.801(1)(c), Fla. Stat. (2017). Section 90.801(2)(c) provides an exception to the hearsay rule: "A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is . . . [o]ne of identification of a person made after perceiving the person." § 90.801(2)(c), Fla. Stat. (2017). An "out-of-court statement of identification is admissible in court to prove the truth of the matter asserted, e.g., to prove that the person identified was the person who committed the act." Charles W. Ehrhardt, *Florida Evidence* § 801.9, at 992-93 (2017 ed.). "Section 90.801(2)(c) recognizes that an identification made shortly after a

crime, accident, or event is more reliable in most situations than identifications made at a later time." *Id.* at 993. "In addition to the testimony of the person who made the prior identification, section 90.801(2)(c) makes admissible the testimony of a witness who was present at the time of the identification so long as the person making the identification testifies during the trial and is subject to cross-examination concerning the identification." *Id.* at 996.

Here, Cordarius and Parice gave prior sworn statements to the police on the night of the shootings identifying Joseph as the shooter. At trial, the State offered Cordarius' and Parice's out-of-court identifications of Joseph as the shooter through the testimony of Detective Creelman, who was present at the time of the identifications. Specifically, Detective Creelman testified that he interviewed Cordarius on the night of the incident and that "Cordarius told [him] that his brother, Marlin Joseph, had shot Kyra." Detective Creelman also testified that he interviewed Parice on the night of the incident and that "Parice told [him] his brother, Marlin Joseph," was the shooter. The trial court allowed Detective Creelman's testimony regarding the out-of-court identifications under section 90.801(2)(c)'s hearsay exception.

Our decision in *Evans v. State*, 838 So. 2d 1090 (Fla. 2002), is instructive. In *Evans*, we concluded that the testimony of two police officers that two eyewitnesses identified the defendant as the person who shot the victim was admissible as a hearsay exception under section 90.801(2)(c) where the two eyewitnesses testified at trial and were subject to cross-examination concerning their identification of the defendant as the shooter. *Id.* at 1094; *see also Polite v. State*, 41 So. 3d 935, 942 (Fla. 5th DCA 2010) (holding that the State properly elicited testimony about two out-of-court identifications through the police where the State asked the identifying witness on direct examination if she had identified the robber and given the police his name), *quashed on other grounds*, 116 So. 3d 270 (Fla. 2013).

Cordarius' and Parice's out-of-court identifications qualify as an exception to hearsay under section 90.801(2)(c). Cordarius and Parice were eyewitnesses to the crimes and specifically identified Joseph as the shooter on the night of the shootings in their statements to Detective Creelman. *See Ibar v. State*, 938 So. 2d 451, 460 (Fla. 2006) (stating that section 90.801(2)(c) applies to statements of identification made by a witness to a crime); Charles

W. Ehrhardt, *Florida Evidence* § 801.9, at 994-95 (stating that section 90.801(2)(c) "does not specify when or where the identification must be made" but that the identification "should be made near the time the declarant perceived the individual identified"). Further, both Cordarius and Parice testified at trial and were subject to cross-examination concerning their identifications. *See* § 90.801(2)(c), Fla. Stat. Accordingly, because Cordarius' and Parice's out-of-court identifications were not hearsay and were admissible as statements of identifications pursuant to section 90.801(2)(c), we deny relief on this claim.

## D. Testimony Concerning Joseph's Statements About One of the Victims (Claim 4)

Joseph next argues that the trial court erroneously admitted Jeshema Tarver's testimony that she first heard Joseph yelling about Kyra "two days ago," referring to a prior incident that occurred on December 23, 2017 (two days before Christmas and five days before the shootings). Specifically, Joseph argues this testimony was irrelevant, unduly prejudicial, and involved no prior bad act or collateral crime. However, because the testimony was

relevant to proving motive, we conclude that the trial court did not abuse its discretion in admitting Jeshema's testimony.

"A trial court's determination that evidence is admissible will not be disturbed unless the trial court abused its discretion." *Kirkman v. State*, 233 So. 3d 456, 467 (Fla. 2018). "That discretion, however, is limited by the rules of evidence." *Id.* (quoting *Hudson v. State*, 992 So. 2d 96, 107 (Fla. 2008)). "The prerequisite to the admissibility of evidence is relevancy." *Wright v. State*, 19 So. 3d 277, 291 (Fla. 2009). "Under Florida law, all relevant evidence, defined as that tending to prove or disprove a material fact, is admissible unless otherwise provided by law." *Morris v. State*, 219 So. 3d 33, 42 (Fla. 2017).

Here, after Jeshema testified concerning the argument she heard between Joseph and Crowell while in the shower, she indicated that this was not the first time she heard Joseph yelling about Kyra. Jeshema testified that she heard Joseph yelling about Kyra on December 23, 2017 (two days before Christmas and five days before the shootings). At that time, Joseph told his mother that Kyra had one more time to make him mad or to bother and that Kyra needed to leave Kamare alone.

Jeshema's testimony was relevant to show Joseph's motive for committing the murders. We have explained that "evidence may be admitted in a criminal case if it is relevant as to the motive for the crime involved." *State v. Riechmann*, 777 So. 2d 342, 365 (Fla. 2000). Jeshema's testimony about what she heard Joseph tell Denson provided a reason for Joseph's eventual aggression towards Crowell and Kyra—Joseph was upset with Kyra because she kept bothering his daughter, Kamare. Joseph's statement to Denson that Kyra had one more time to make him mad, when coupled with testimony that Kyra and Kamare got into an argument on the day of the murders, is highly probative. Kyra and Kamare's argument on the day of the murders served as the "one more time" to make Joseph mad, explaining why he killed Kyra and Crowell that night. Accordingly, we deny relief on this claim.

### E. Denial of Motion to Dismiss Charges (Claim 5)

Joseph further argues that the trial court erred in denying his motion to dismiss charges, which alleged constitutional violations occurred while Joseph received treatment at Treasure Coast Forensic Treatment Center. Specifically, he asserts that Treasure Coast's staff, in training him to be competent, violated his

constitutional rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. However, as argued by the State, Joseph's claim is vague, conclusory, and lacks specificity. Joseph fails to provide facts to support his claims of the alleged constitutional violations. Accordingly, we deny relief on this claim.

### F. Denial of Motion to Interview Jurors (Claim 6)

Joseph argues that the trial court erred in denying his motion to interview jurors. "A trial court's decision on a motion to interview jurors is reviewed pursuant to an abuse of discretion standard." *Anderson v. State*, 18 So. 3d 501, 519 (Fla. 2009). "The trial court does not abuse its discretion in denying motions to interview jurors based on juror bias or misconduct where there is no indication of bias or misconduct in the record." *Johnston v. State*, 63 So. 3d 730, 739-40 (Fla. 2011). Further, in order to be entitled to interview jurors, Joseph must present "sworn allegations that, if true, would require the court to order a new trial because the alleged error was so fundamental and prejudicial as to vitiate the entire proceedings." *Johnson v. State*, 804 So. 2d 1218, 1225 (Fla. 2001). Here, Joseph alleged that a prospective juror had a conversation with Robin

Denson (Joseph's mother) after the juror was excused from the venire panel. In this conversation, the juror said the entire jury panel discussed the case among themselves, disregarding the trial court's instructions. The juror also said all of the prospective jurors had already made up their minds in wanting to sentence Joseph to death. The trial court denied Joseph's motion, finding there was insufficient evidence to support the need for juror interviews or to show that the verdict may be subject to challenge. The trial court did not find Denson's statements reliable because Denson never brought this to the trial court's attention yet brought other matters to the court's attention. The trial court also found Denson's statements not reliable because they were not supported by the prospective juror who spoke to the trial court and attorneys about the concerns she had sitting on the case before being excused. Because the allegations in Joseph's motion would not constitute sufficient grounds to support a new trial, we conclude that the trial court did not abuse its discretion in denying the motion to interview jurors.

### G. HAC Aggravator (Claim 9)

Next, Joseph argues that there is insufficient evidence to support the HAC aggravator. We disagree. The HAC aggravator applies to murders that are both "conscienceless or pitiless and unnecessarily torturous to the victim." *Francis v. State*, 808 So. 2d 110, 134 (Fla. 2001). The focus is "on the *means and manner* in which death is inflicted and the immediate circumstances surrounding the death." *Buzia v. State*, 926 So. 2d 1203, 1211-12 (Fla. 2006) (quoting *Barnhill v. State*, 834 So. 2d 836, 849-50 (Fla. 2002)). Gunshot murders can qualify as HAC if the events preceding the death "cause the victim fear, emotional strain, and terror." *Marquardt v. State*, 156 So. 3d 464, 488 (Fla. 2015). To support HAC, "the evidence must show that the victim was conscious and aware of impending death." *King v. State*, 130 So. 3d 676, 684 (Fla. 2013) (quoting *Douglas v. State*, 878 So. 2d 1246, 1261 (Fla. 2004)). "However, the victim's perception of imminent death need only last seconds for this aggravator to apply." *Gonzalez v. State*, 136 So. 3d 1125, 1162 (Fla. 2014).

In applying this aggravator, the trial court found the following as to Crowell:

Here, the Defendant shot Kaladaa Crowell in her home while her child was present. Although the medical examiner testified that he could not conclusively opine based on examining the body the exact sequence of the gunshots, he did opine that at least one of the shots to the head was fatal and would have rendered Kaladaa Crowell unconscious immediately. However, the State presented testimony that Jeshema Tarver heard multiple gunshots as she was showering. She also heard Kaladaa Crowell begging for help and for someone to call 911 after she heard the first round of gunshots. Jeshema got out of the shower and while getting dressed, heard a final shot. There was no testimony that Kaladaa ever spoke another word after the sound of that last shot.

This series of events clearly establishes that Kaladaa Crowell was alive after being shot multiple times, as she was heard begging for help and for someone to call 911. Based on Jeshema's testimony, and the testimony of the medical examiner that one of the gunshot wounds to the head would have rendered Kaladaa unconscious immediately, it is reasonable to conclude that Kaladaa Crowell received her fatal gunshot wound last. This evidence establishes that Defendant fired multiple shots into her body, and that she laid there begging for help. Moments passed, and when Defendant realized she still was not dead, he delivered the final shot killing her. Kaladaa thus was well aware of her impending death, and the act of the final shot was conscienceless and pitiless.

We conclude that competent, substantial evidence supports the trial court's finding as to Crowell. The evidence showed that Crowell sustained several gunshot wounds to different parts of her body—back of right hand, belly, left thigh, left calf, chest, back of head, and forehead. The gunshot wound to Crowell's forehead was

fatal, breaking her skull and destroying her brain. Despite the medical examiner being unable to determine the order of the gunshots, Jeshema's testimony established that Crowell was alive after being shot multiple times and that she received her fatal gunshot wound last. Specifically, Jeshema testified that she heard three gunshots while showering and then heard Crowell screaming, crying, and asking for someone to call 911. Jeshema then heard another shot and did not hear anything from Crowell after this shot. The medical examiner testified that the gunshot wound to Crowell's forehead would have rendered her unconscious immediately.

The evidence presented also indicated that Crowell endured physical pain, emotional strain, fear, and terror before being killed. The medical examiner testified that each gunshot individually would have caused pain to Crowell if she was conscious. This testimony, coupled with Jeshema's testimony, established that Crowell experienced pain from the nonfatal gunshot wounds that preceded the fatal shot. While it is unclear how much time passed between the nonfatal shots and the fatal shot, "the victim's perception of imminent death need only last seconds for [the HAC] aggravator to apply." *Allred v. State*, 55 So. 3d 1267, 1280 (Fla.

2010).  As further evidence that Crowell was conscious and aware of impending death, the medical examiner testified that the gunshot wound on the back of Crowell's right hand was indicative of a defensive wound.  *See Hall v. State,* 107 So. 3d 262, 276 (Fla. 2012) ("[W]hen a victim sustains defense-type wounds during the attack, it indicates that the victim did not die instantaneously and in such a circumstance HAC was proper.").  Further, immediately prior to the murder, Joseph and Crowell were arguing about Kyra being mean to Kamare, so Crowell was aware Kyra was home and in danger.  *See Gonzalez,* 136 So. 3d at 1163 (finding competent, substantial evidence to support the HAC aggravator where one of the victims, aware of her impending death, knew that her children were probably also in grave danger).

Next, as to Kyra, the trial court found the following:

> Kyra Inglett was in her home when Defendant shot her mother multiple times.  Undoubtedly, Kyra heard her mother crying and begging for help as she laid on the floor.  Having just seen this, Kyra fled from her home.  She was looking back as Defendant was chasing her down.  Defendant's own brother tried to stop the attack but was unsuccessful.  Defendant then shot Kyra five (5) times.  Kyra was aware of her impending death.  There can be nothing more terrifying for a child than knowing that someone has just shot their mother multiple times and now was coming after them.  There is no doubt that

- 38 -

this panic-stricken little girl experienced a level of terror that no child or no one should ever have to endure.

Here, competent, substantial evidence supports the trial court's finding of the HAC aggravator as to Kyra. The evidence showed that Kyra sustained several gunshot wounds to different parts of her body—left buttock, lower back, right side of head, and back of head. The gunshot wound to the back of Kyra's head was fatal, damaging her skull and brain. Unlike Crowell, there is no evidence indicating Kyra was still alive after the first gunshot and thus suffered any physical pain. But a finding of HAC does not require the victim to undergo physical torture; mental torture is sufficient. *See, e.g., Gonzalez,* 136 So. 3d at 1162 ("[T]he HAC aggravating circumstance will apply in cases where the victim is terrorized before being shot or endures fear and emotional strain or the infliction of mental anguish.").

Here, the circumstances preceding Kyra's death caused her fear, emotional strain, and terror. The evidence demonstrated that Kyra was inside the home at the time Crowell was shot. Testimony from Denson placed Kyra in the living room, and Crowell's body was found between the living area and dining room. Therefore, it can be

reasonably inferred that Kyra saw Joseph shoot her mother or, at minimum, heard the gunshots directed at her mother. *See Heyne v. State*, 88 So. 3d 113, 122-23 (Fla. 2012) (finding competent, substantial evidence to support the trial court's finding that the five-year-old victim experienced fear and terror prior to her death where she witnessed her mother and father being murdered). Parice also testified that after he heard gunshots coming from inside the house, he saw Kyra run outside, looking backwards, and Joseph was running after her with a gun. This evidence leaves no doubt that Kyra was aware of her impending death. Accordingly, Joseph is not entitled to relief on this claim.[9]

---

9. Given our conclusion that competent, substantial evidence supports the trial court's HAC finding, Joseph's argument that the jury should not have been instructed on the HAC aggravator and Joseph's argument that the trial court erroneously assigned great weight to the HAC aggravator necessarily fail. *See Colley v. State*, 310 So. 3d 2, 15 n.10 (Fla. 2020) ("Given our conclusion on the sufficiency of the evidence underlying the trial court's finding, we necessarily reject Colley's argument that the court erred by instructing the jury on the HAC aggravator."); *Jean-Philippe v. State*, 123 So. 3d 1071, 1082 (Fla. 2013) ("[O]nce a trial court finds that an aggravating circumstance has been established beyond a reasonable doubt, the weight to be given 'is within the discretion of the trial court, and it is subject to the abuse of discretion standard.' " (quoting *Bright v. State*, 90 So. 3d 249, 261 (Fla. 2012))).

## H. CCP Aggravator (Claim 10)

Joseph also argues that the trial court erred in finding that the CCP aggravator was proven beyond a reasonable doubt. To prove the CCP aggravator, the court must find that

> the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.

*Franklin v. State*, 965 So. 2d 79, 98 (Fla. 2007). The CCP aggravator may be proven by demonstrating such facts as (1) "advance procurement of a weapon," (2) "lack of resistance or provocation," and (3) "the appearance of a killing carried out as a matter of course." *Id.* (quoting *Swafford v. State*, 533 So. 2d 270, 277 (Fla. 1988)).

Here, competent, substantial evidence supports the trial court's finding of the CCP aggravator as to both Crowell and Kyra. Joseph armed himself with a firearm, as evidenced by Parice's testimony that he saw Joseph with a gun a couple of days prior to the murders. *See Franklin*, 965 So. 2d at 98 ("In a number of cases, we have cited the defendant's procurement of a weapon in

advance of the crime as indicative of preparation and heightened premeditated design."). Further, there is no record evidence suggesting Joseph killed Crowell and Kyra out of frenzy, panic, or rage. Denson testified that, on the day of the murders, Joseph, Kyra, and Crowell were all present in the home when she got home from work. Joseph was in his room reading the Bible, Kyra was sitting on the couch in the living room, and Crowell was in her room folding laundry. Denson did testify that Joseph was being disrespectful towards Kamare's mother (who was not there) during a conversation Denson had with Joseph immediately prior to the murders. However, Denson explicitly testified that Joseph was not upset during this conversation. There is also no evidence of provocation from either Crowell or Kyra. Rather, the evidence indicates that all things were normal at the house that night. Joseph was in his room reading the Bible and, when he was ready to carry out his plan, he confronted Crowell and shot her. Joseph then chased Kyra out of the house and shot her.

As to heightened premeditation, in addition to the procurement of a weapon in advance of the crime, Joseph was heard on December 23, 2017 (two days before Christmas and five

days before the murders) yelling to Denson about Kyra saying she had one more time to make him mad and that she needed to leave his daughter alone. That "one more time" incident occurred on the day of the murders. Joseph had time to consider his plan before carrying it out. Joseph did not confront Crowell or Kyra immediately after getting home from work. Joseph was in his room reading the Bible while Crowell was in her room folding laundry, and Kyra was in the living room on the couch. When he was ready, Joseph then confronted Crowell about the incident between Kyra and Kamare. Out of the nine people present in the home on the night of December 28, 2017, Joseph targeted Crowell and then Kyra. Joseph shot Crowell and Kyra multiple times. The evidence also showed that Joseph could have left both victims alive but, instead, he decided to murder them. *See Turner v. State*, 37 So. 3d 212, 226 (Fla. 2010) ("We have held that CCP exists where, as here, a defendant has ample opportunity to leave, but instead decides to murder the victim."). Testimony presented at trial demonstrated that Crowell was still conscious after the first round of shots and was heard screaming and asking someone to call 911. Joseph, upon seeing Crowell still alive, could have left the crime scene. But

he instead delivered a fatal shot to Crowell's forehead. Joseph again had the chance to flee after killing Crowell. He was tackled by his brother on the way out of the house and still proceeded to chase Kyra and shoot her multiple times, including a fatal shot to the back of the head. Only after this did Joseph flee in Crowell's vehicle. The evidence of Joseph's actions sufficiently supports heightened premeditation.

Lastly, "[a] pretense of legal or moral justification is 'any colorable claim based at least partly on uncontroverted and believable factual evidence or testimony that, but for its incompleteness, would constitute an excuse, justification, or defense as to the homicide.' " *Campbell v. State*, 159 So. 3d 814, 831 (Fla. 2015) (quoting *Nelson v. State*, 748 So. 2d 237, 245 (Fla. 1999)). The evidence in the present case showed no pretense of legal or moral justification for the killing, and Joseph does not argue that the murder was justified.

Moreover, given the other weighty aggravators found in this case, even if the CCP aggravator were invalid, there is no reasonable possibility that an absence of this one aggravator would have resulted in a different sentence. *See Hall v. State*, 246 So. 3d 210,

215 (Fla. 2018) (concluding that an error in finding the existence of CCP was harmless because "Hall has significant and weighty aggravation beyond the invalidated CCP aggravator"). Accordingly, we deny relief on this claim.[10]

## I. Prosecutor's Penalty-Phase Comments (Claim 13)

Joseph challenges a number of prosecutorial comments made during penalty-phase closing argument and argues that the trial court erred in denying his motions for mistrial directed at those comments. Because the prosecutor's comments were proper, or if improper not so prejudicial as to vitiate Joseph's entire trial, we conclude that the trial court did not abuse its discretion in denying Joseph's motions for mistrial during the State's penalty-phase closing argument.

---

10. Given our conclusion that competent, substantial evidence supports the trial court's CCP finding, Joseph's argument that the trial court erroneously assigned great weight to the CCP aggravator necessarily fails. *See Lowe v. State*, 259 So. 3d 23, 58 (Fla. 2018) ("In reviewing the finding of an aggravating circumstance, '[i]t is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt—that is the trial court's job.'" (quoting *Willacy v. State*, 696 So. 2d 693, 695 (Fla. 1997))).

Joseph first challenges the prosecutor's comment that Joseph did not care about jail: "[T]here is no question that he understood the criminality. It's just he didn't care. Didn't care. He was on probation, ladies and gentlemen. You heard the probation officer say that any crime can violate you. Still doesn't. Doesn't care about jail. That's why that punishment is not appropriate." Defense counsel objected to this comment, and the trial court sustained the objection. After the trial court denied Joseph's subsequent motion for mistrial, he requested a curative instruction to be read in the alternative, which the trial court agreed to give. This Court reviews a trial court's denial of a motion for mistrial for an abuse of discretion, where a defendant contemporaneously objects, and the trial court sustains the objection and gives a curative instruction. *Truehill v. State*, 211 So. 3d 930, 949-50 (Fla. 2017). " 'A motion for mistrial should be granted only when it is necessary to ensure that the defendant receives a fair trial.' In other words, '[a] motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial.' " *Smiley v. State*, 295 So. 3d 156, 169 (Fla. 2020) (quoting *Morris*, 219 So. 3d at 44).

The State's comment that Joseph did not care about jail was made in the context of mitigating circumstances. Specifically, the State was arguing that Joseph's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired. The State noted the fact that Joseph did not turn himself in, evading police for five days before being caught. It further noted that Joseph was on probation and that he was instructed on the conditions of probation. The State argued that Joseph's willingness to commit a new law violation and flee showed that he did not care about jail, and therefore, life imprisonment was an inappropriate punishment. Joseph objected and argued that the fact that he did not care about jail is not a proper aggravating circumstance.

While improper, this comment alone was not so prejudicial as to vitiate the entire trial. For one, the comment was brief and isolated. *See Truehill,* 211 So. 3d at 949 (finding that a brief "partners in crime" comment did not deprive the defendant of a fair and impartial trial or materially contribute to the conviction); *Fletcher v. State,* 168 So. 3d 186, 209 (Fla. 2015) (denying relief where the prosecutor's "send a message" comment, although

improper, was iterated only three times, all at roughly the same time).  And two, the trial court sustained Joseph's objection and gave his requested curative instruction, informing the jury that the fact that Joseph did not care about jail is not a proper aggravating circumstance to be considered.  *See, e.g.*, *Card v. State*, 803 So. 2d 613, 621-22 (Fla. 2001) (holding that the trial court did not abuse its discretion in refusing to grant a mistrial for the prosecutor's comments, where the trial court sustained the objection and gave curative instructions).  Accordingly, in light of the entire record at the penalty phase, this brief and isolated comment was not so prejudicial as to vitiate the entire trial, and the trial court did not abuse its discretion in denying Joseph's motion for mistrial directed at this comment.

    Joseph next challenges the following comment: "When that gets turned in, ladies and gentlemen, this doesn't happen unless she [the trial judge] thinks it should."  Joseph objected to this comment, but the trial court did not rule on the objection.  However, the trial court did rule on Joseph's motion for mistrial directed at this comment.  When a trial court does not rule on a defendant's objection but simply denies the defendant's motion for

mistrial, this Court applies an abuse of discretion standard to the trial court's ruling on the motion for mistrial. *See Poole v. State*, 997 So. 2d 382, 391 n.3 (Fla. 2008).

This comment was made in the context of the State's broad argument that, based on the evidence, jury instructions, aggravating factors, and mitigating circumstances, the correct and proportionate sentence was death. Specifically, the State was referring to the fact that the jury makes a recommendation of death and that it is the trial court who ultimately decides whether to impose a sentence of death. *See* § 921.141(3), Fla. Stat. (2017). Joseph objected and argued that the prosecutor's comment diminished the jurors' roles.

The prosecutor's comment did not diminish the jurors' roles and was not improper. Although perhaps stated ineloquently, it is true that a jury's recommendation of death "doesn't happen" unless the trial court "thinks it should." *See Delgado v. State*, 162 So. 3d 971, 981 (Fla. 2015) ("[R]egardless of the jury's recommendation, the trial judge must conduct an independent analysis of the aggravating and mitigating circumstances." (quoting *Phillips v. State*, 39 So. 3d 296, 305 (Fla. 2010))). Before imposing a sentence

of death, a trial court must first consider each aggravating factor unanimously found by the jury and all mitigating circumstances. *See* § 921.141(3)(a)2., Fla. Stat. (2017). And, even if the jury recommends a sentence of death, the trial court can still impose a sentence of life imprisonment. *See id.*

Any potential issue of the State's comment diminishing the jurors' roles was assuaged by the trial court's instruction immediately after Joseph's objection, as well as the State's comments following the instruction. The trial court informed the jury that the court was the one who imposes the final sentence but that it would weigh the jury's recommendation very heavily. The State then essentially restated what the trial court just said—that the trial court would consider the jury's recommendation of death, weigh the recommendation with everything else, and ultimately decide whether to impose a sentence of death. Because the State's comment was a correct, albeit imprecise, statement of the law and because any potential harm was cured by the trial court's instruction and the State's subsequent comments, the trial court did not abuse its discretion in denying Joseph's motion for mistrial directed at this comment.

Joseph's final challenge is directed at the following comment: "And the person that committed them has provided no mitigation worthy to allow him to live out his days in jail . . . ." Joseph objected to this comment, but the trial court did not rule on the objection. The trial court did, however, rule on Joseph's motion for mistrial after doing a read-back of the transcript. As with the previous comment, this Court's standard of review of the trial court's denial of the motion for mistrial is abuse of discretion. *See Poole*, 997 So. 2d at 391 n.3.

This comment was made at the end of the State's closing argument. The State was arguing that a recommendation of death was appropriate because the murders in this case were different. It then made the mitigation comment. Joseph objected and argued that the State commented on his right to remain silent.

The State did not comment on Joseph's right to remain silent. Rather, the State was referring to the defendant's burden to prove mitigating circumstances. *Bright v. State*, 299 So. 3d 985, 1000 (Fla. 2020) ("This Court has held that a mitigating circumstance exists where it is established by the greater weight of the evidence."). The trial court noted that the prosecutor was

commenting on the fact that no mitigation had been presented. The prosecutor actually stated that Joseph had not presented any "mitigation worthy to allow him to live out his days in jail." The State was not saying Joseph failed to present any mitigation evidence whatsoever; it was saying Joseph had failed to present mitigation sufficient to warrant a life sentence rather than a death sentence. Because this was not a comment on Joseph's right to remain silent, the trial court did not abuse its discretion in denying Joseph's motion for mistrial directed at this comment. Accordingly, we deny relief on this claim.

### J. Jury's Failure to Follow the Law (Claim 14)

Joseph argues that he was deprived of a fair trial because the jury acted out of emotion, misapprehension, or outright refusal to follow the law or the trial court's instructions in the penalty phase of the trial. Specifically, Joseph focuses on the fact that the jury deliberated for only two hours and found no mitigating circumstances. We agree with the State that there is no factual basis to support Joseph's claim. *See Lowe v. State*, 259 So. 3d 23, 52 (Fla. 2018) ("[I]n the absence of evidence to the contrary, [this Court] presume[s] that jurors follow the trial court's instructions.").

Accordingly, because this claim is unsupported by the evidence, we deny relief on this claim.

### K. Cumulative Error (Claim 15)

Joseph argues that numerous errors in this case, when considered cumulatively, deprived him of a fair trial and due process. "[W]here the alleged errors urged for consideration in a cumulative error analysis are individually 'either procedurally barred or without merit, the claim of cumulative error also necessarily fails.' " *Salazar v. State*, 188 So. 3d 799, 818 (Fla. 2016) (quoting *Hurst v. State*, 18 So. 3d 975, 1015 (Fla. 2009)). None of Joseph's alleged errors have merit. Further, Joseph does not identify any particular errors that cumulatively deprived him of a fair trial. *See Dufour v. State*, 905 So. 2d 42, 75 (Fla. 2005) (concluding that the defendant did not articulate his cumulative error claim in a manner upon which this Court could afford relief where he simply referred to the "sheer number and types of errors involved" in his trial). Accordingly, we deny relief on this claim.

### L. Sufficiency of the Evidence (Claim 16)

"In appeals where the death penalty has been imposed," regardless of whether the defendant raises the sufficiency of the

evidence as an issue on appeal, "this Court independently reviews the record to confirm that the jury's verdict is supported by competent, substantial evidence." *Davis v. State*, 2 So. 3d 952, 966-67 (Fla. 2008); *see also* Fla. R. App. P. 9.142(a)(5).

Here, while most of the State's evidence is circumstantial and Joseph's mother and brothers, who were eyewitnesses to the murders, recanted in their testimony at trial, there is competent, substantial evidence to support Joseph's two first-degree murder convictions. First, Jeshema testified that while she was in the shower, she heard Joseph and Crowell arguing and then heard three loud bangs, and Crowell screaming and crying out for help. Further, Parice testified that he heard gunshots and then saw Kyra running out of the house, looking backwards as she ran. Parice then saw Joseph come outside with a gun and tried to tackle him. No one else was seen with a gun that night. Detective Creelman testified as to Parice's and Cordarius' statements made on the night of the murders. Specifically, Detective Creelman testified that Parice told him that Joseph was the shooter, and Cordarius told him that Joseph shot Kyra. Joseph was also the only person present at the home that night who was not at the crime scene

when police arrived—he was seen leaving in Crowell's car after Kyra and Crowell were shot. And already we have explained that Joseph's actions—including arming himself in advance, specifically targeting Crowell and Kyra and shooting them without any provocation—demonstrate not just premeditation but heightened premeditation.

The State also provided a motive for the murders. On December 23, 2017 (two days before Christmas and five days before the incident), Jeshema testified that she heard Joseph yelling to Denson about Kyra saying that Kyra had one more time to make him mad or to bother and that she needed to leave Kamare alone. On the day of the murders, Kyra and Kamare got into an argument before lunch. That night, immediately before gunshots were heard, Joseph was heard arguing with Crowell, asking her why Kyra was being mean to his daughter.

The medical examiner's testimony showed that both Kyra and Crowell sustained multiple gunshot wounds to various parts of their bodies. Both victims incurred fatal gunshot wounds to the head. Accordingly, competent, substantial evidence supports Joseph's two first-degree murder convictions.

### III. CONCLUSION

We affirm Joseph's convictions for first-degree murder and his sentences of death.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, MUÑIZ, COURIEL, and GROSSHANS, JJ., concur.
LABARGA, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

For the reasons expressed in my dissenting opinion in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020) (receding from proportionality review requirement in death penalty direct appeal cases), I can only concur in the result.

An Appeal from the Circuit Court in and for Palm Beach County,
Cheryl Caracuzzo, Judge
Case No. 502017CF012413AXXXMB

Fredrick R. Susaneck of Levine & Susaneck, P.A., West Palm Beach, Florida,

for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Rhonda Giger, Assistant Attorney General, West Palm Beach, Florida,

for Appellee